## LIISA J. ARCHAMBAULT *VS.* DAVID J. ARCHAMBAULT.

Middlesex. February 8, 1990. - June 7, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Divorce and Separation,* Child custody, Foreign determination as to custody of child. *Jurisdiction,* Custody of child. *Probate Court,* Jurisdiction, Custody of child. *Parental Kidnapping Prevention Act. Statute,* Federal preemption. *Constitutional Law,* Supremacy of Federal law.

In response to a reported question of law, this court held that, under the supremacy clause of the Federal Constitution, the second paragraph of G. L. c. 209B, § 11 (*b*), inserted by St. 1987, c. 52, concerning a court's exercise of discretion to order or compel a child to attend a custody proceeding in another State, was impliedly preempted by the Federal Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A (1982). [564-571]

COMPLAINT for divorce filed in the Middlesex Division of the Probate and Family Court Department on September 30, 1985.

A motion for a determination of probable cause pursuant to G. L. c. 209B, § 11 (*b*), was heard by *Vincent F. Leahy,* J., and a question of law was reported by him to the Appeals Court. The Supreme Judicial Court granted a request for direct review.

*Rosanna Cavallaro,* Assistant Attorney General, for the Attorney General, intervener.

*Beth S. Herr* (*Lisa M. Wilson & Gershon M. Gulko* with her) for for Liisa J. Archambault.

*Floyd H. Anderson* for David J. Archambault.

*Cynthia H. N. Post* for the guardian ad litem.

LIACOS, C.J. In this case, we are presented once again with the distressingly familiar litigation which arises when parents who have decided to divorce engage in a protracted

legal tug-of-war over the custody of their children. The present custody battle, which has involved the courts and administrative agencies of both Massachusetts and New Hampshire, spans nearly eight years, during which time the child who is the subject of the dispute has grown from a toddler to an eight year old boy. Despite this lengthy passage of time and the considerable expenditure of judicial and administrative resources, a permanent custody decision regarding the child has yet to be reached. As may be expected, the procedural history of this case is complicated and, in our opinion, unnecessarily voluminous. Nevertheless, a thorough review of the development of this case is needed to provide a contextual framework for the legal analysis which drives our conclusion.

*Prior proceedings.* On September 8, 1983, Liisa J. Archambault filed for divorce from her husband, David J. Archambault, in the Superior Court of Hillsborough County, New Hampshire (New Hampshire court). Liisa and David had married in New Hampshire in 1981 and had established their marital home in that State. Liisa's complaint for divorce requested that she be granted temporary and permanent custody of the parties' minor child, Sean Archambault, who had been born on April 1, 1982. The New Hampshire court issued an order which granted temporary physical custody of Sean to Liisa and visitation rights to David, while a permanent custody determination was pending. During this time, Liisa moved to Massachusetts with Sean.

The New Hampshire court also appointed a guardian ad litem to investigate permanent custody issues. After a two-year investigation, the guardian ad litem recommended that David be granted permanent physical custody of Sean. A final hearing on the complaint for divorce was scheduled in the New Hampshire court for August 1, 1985.

Prior to the scheduled hearing date, the guardian ad litem received reports that Sean had been sexually abused both by David and by Sean's paternal grandfather. In response to these allegations, the guardian ad litem requested that the hearing be continued. The New Hampshire court granted

this request and also suspended David's visitation rights and ordered an investigation into the allegations of sexual abuse. At approximately the same time, the Massachusetts Department of Social Services (DSS) undertook its own investigation of the allegations in response to a report of probable sexual abuse of Sean, which had been filed with DSS pursuant to G. L. c. 119, § 51A (1988 ed.). The DSS eventually issued a report referring the matter to the New Hampshire Child Services Agency.

On September 30, 1985, Liisa filed a complaint for divorce in the Middlesex Probate and Family Court of Massachusetts (Probate and Family Court). The judge issued a temporary order which granted Liisa physical custody of Sean and prevented David from having any contact with Sean. The judge also appointed a guardian ad litem to investigate the allegations of sexual abuse and to recommend visitation rights for David.

On October 2, 1985, the New Hampshire court entered an ex parte order granting temporary physical custody of Sean to David's sister-in-law, and temporary legal custody of the boy to the New Hampshire Department of Welfare. This order was entered after Liisa failed to comply with an order of the New Hampshire court regarding the evaluation of Sean by a court appointed psychologist.

On October 22, 1985, the Probate and Family Court entered an order staying the divorce proceedings in Massachusetts and deferring to the jurisdiction of the New Hampshire court. Liisa was ordered to submit both herself and Sean to the New Hampshire court. Liisa appealed the order of the Probate and Family Court to the Appeals Court, which granted a temporary stay of the lower court's order. On May 9, 1986, the Appeals Court affirmed the judgment of the Probate and Family Court, allowing Liisa thirty days to apply to the New Hampshire court for a hearing requesting modification of the New Hampshire orders regarding custody of Sean. Although Liisa and Sean remained in Massachusetts, Liisa filed such a request, and the New Hampshire court scheduled a hearing for July 9, 1986.

In early June, 1986, DSS, pursuant to G. L. c. 119 (1988 ed.), filed a care and protection complaint concerning Sean in the Ayer Division of the District Court. In response to this complaint, the District Court judge entered an order on June 6, 1986, granting temporary legal custody of Sean to the DSS and prohibiting anyone from interfering with Sean's "liberty or present domicile." The District Court judge also ordered a new investigation into Sean's situation and scheduled the matter for hearing on July 28, 1986.

On July 9, 1986, Liisa failed to appear in the New Hampshire court for the hearing that she had requested. Accordingly, her motion for a modification of the New Hampshire custody arrangement was denied. David then filed a petition for relief with a single justice of this court pursuant to G. L. c. 211, § 3 (1988 ed.), requesting that the orders of the Ayer District Court be vacated and that further proceedings in that court be dismissed or stayed. The Ayer District Court stayed any further proceedings during the pendency of David's c. 211, § 3, petition. On August 14, 1986, a single justice of this court ruled that the order of the Ayer District Court represented a "collateral attack" on the judgment of the Appeals Court which had upheld the order that Liisa and Sean submit to the jurisdiction of the New Hampshire court. Accordingly, the District Court order was vacated by the single justice.

Liisa appealed from the decision of the single justice to the full court. During the pendency of this appeal, Liisa filed one motion in the New Hampshire court to dismiss the proceedings there, and another in the Probate and Family Court to vacate the stay of proceedings in Massachusetts. Both of these motions were denied. Liisa then petitioned the single justice of the Appeals Court, requesting a determination of Sean's custody pursuant to G. L. c. 209B, § 2 (*a*) (3) (1988 ed.), the emergency provision of the Massachusetts Child Custody Jurisdiction Act. Liisa referred to clinical examinations which suggested that Sean had suffered sexual abuse at the hands of David and Sean's paternal grandfather. The Appeals Court's single justice denied Liisa's petition, ruling

that "[t]here is no present emergency." He stated further that "it is far from clear that harm will befall the child if New Hampshire takes a considered look at the situation," and suggested that the proper course for Liisa would be to request the New Hampshire court to modify its custody order on the basis of the clinical examinations which Liisa had presented to the Massachusetts courts.

A pivotal event in the labyrinthine progress of this case occurred on May 11, 1987, when the Legislature amended § 11 (b) of the Massachusetts Child Custody Jurisdiction Act. G. L. c. 209B. See St. 1987, c. 52 (an emergency act, effective on approval). In general, § 11 (b) empowers Massachusetts courts with the discretion to order persons in the Commonwealth to appear in custody proceedings which are being held in a court of another State. The 1987 amendment added the following passage to § 11 (b):

> "Notwithstanding any provision of this chapter to the contrary, no child shall be ordered or compelled to appear or attend such proceeding in another state when, after a hearing a judge makes a finding that there is probable cause to believe that such child may be placed in jeopardy or exposed to risk of mental or physical harm by such return to said other state."

On July 28, 1987, Liisa filed a motion in the Probate and Family Court for a probable cause hearing pursuant to the amendment of § 11 (b). In response, the judge issued an order and a memorandum of decision requiring Liisa to submit to the jurisdiction of the New Hampshire court within thirty days, and finding her guilty of contempt of court for her failure to comply with the October 22, 1985, order to appear before the New Hampshire court. However, on August 18, 1987, the Probate and Family Court judge granted Liisa's motion for a probable cause hearing and stayed the order to submit to the New Hampshire court pending the outcome of the hearing. The judge required that, before the probable cause hearing took place, all parties must submit memoranda

of law addressing the constitutionality of the amendment to G. L. c. 209B, § 11 (*b*).[1]

On February 23, 1989, the guardian ad litem filed a motion in the Probate and Family Court requesting the reconsideration of the allowance of Liisa's motion for a probable cause hearing. On May 19, 1989, after a hearing, the Probate and Family Court judge allowed the motion for reconsideration and denied Liisa's motion for a probable cause hearing on the basis that the 1987 amendment to G. L. c. 209B, § 11 (*b*), "conflicts with the Federal Parental Kidnapping Prevention Act (PKPA) and is therefore preempted by the PKPA." Pursuant to his powers under G. L. c. 215, § 13 (1988 ed.), the judge reported the following question to the Appeals Court:

> "Whether the 1987 Amendment to G. L. Ch. 209B, § 11(b), St. 1987 ch. 52 is preempted by the Parental Kidnapping Prevention Act, 28 U.S.C. § 1738A pursuant to the Supremacy Doctrine and is void as a result."

Prior to consideration of this question by the Appeals Court, David applied to this court for direct appellate review. We granted his application, and affirm the decision of the Probate and Family Court.

*The constitutionality of G. L. c. 209B, § 11 (b), second par.* "The Supremacy Clause of Art. VI of the [Federal] Constitution provides Congress with the power to preempt state law." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368 (1986).[2] Because the power of preemption lies

---

[1]On October 11, 1988, the Attorney General, the Secretary of Human Services, the Commissioner of the Department of Social Services, and the Commissioner of the Office for Children sought and obtained leave to file a memorandum amici curiae in support of the constitutionality of the statute.

[2]Article VI of the United States Constitution states: "This Constitution, and the Laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding."

within the discretion of Congress, "[any] preemption ques-
tion requires an examination of congressional intent."
*Schneidewind* v. *ANR Pipeline Co.*, 485 U.S. 293, 299
(1988). "The critical question in any preemption analysis is
always whether Congress intended that federal [law] super-
sede state law." *Louisiana Pub. Serv. Comm'n* v. *FCC*,
*supra* at 369.

Discussion of the application of Federal preemption princi-
ples generally takes place within the two categories of "ex-
press" or "implied" preemption, in which it is determined
whether Congress (1) by express statement has preempted
State law, or (2) by the nature of the Federal law has im-
plied that State law is preempted. See, e.g., *Schneidewind* v.
*ANR Pipeline Co.*, *supra* at 299-300. Our primary source of
insight for determining whether Congress intended the Pa-
rental Kidnapping Prevention Act (PKPA) expressly or im-
pliedly to preempt State law such as G. L. c. 209B, § 11 (*b*),
second par., is found in the language of the PKPA, where
evidence of Congress's intent has been reduced to its most
basic form. As we examine this language, however, we refer
to a primary tenet of Federal preemption analysis, which
states that Congress is presumed to "not intend to displace
state law." *Maryland* v. *Louisiana*, 451 U.S. 725, 746
(1981). See *Arthur D. Little, Inc.* v. *Commissioner of
Health & Hosps. of Cambridge*, 395 Mass. 535, 545 (1985).

From the language of the PKPA, we conclude that Con-
gress did not intend expressly to preempt any State law, let
alone the manner of State law represented by the second par-
agraph of G. L. c. 209B, § 11 (*b*). Nowhere in the PKPA is
there any explicit reference to preemption. We consider the
absence of any "preemption" language in the PKPA in light
of other Federal statutes which devote entire sections entirely
to the preemptive effect of the Federal law. For example, in
15 U.S.C. §§ 1331 et seq. (1982 & Supp. IV 1986), more
commonly known as the Federal Cigarette Labelling Act, §
1334 is entitled, "Preemption" and details specifically what
types of State laws have been preempted. Therefore, we see

that Congress, when it wishes expressly to preempt State law, makes its intention abundantly clear. We discern no such intention in the express language of the PKPA. However, in the absence of express preemption, it still remains to us to determine whether Congress, by the very nature of the PKPA, intended impliedly to preempt State laws such as G. L. c. 209B, § 11 (*b*), second par.

The United States Supreme Court has "consistently recognized that '[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." *Rose* v. *Rose*, 481 U.S. 619, 625 (1987), quoting *In re Burrus*, 136 U.S. 586, 593-594 (1890). In deference to this traditional function of the States, the United States Supreme Court has declared that a Federal law will not be found to preempt a State family law, such as is involved in the present case, unless "Congress has 'positively required by direct enactment' that state law be preempted." *Hisquierdo* v. *Hisquierdo*, 439 U.S. 572, 581 (1979), quoting *Wetmore* v. *Markoe*, 196 U.S. 68, 77 (1904). The standard to be applied in determining whether the supremacy clause requires that the State family law be preempted is whether the State law does " 'major damage' to 'clear and substantial' federal interests." *Hisquierdo* v. *Hisquierdo, supra*, quoting *United States* v. *Yazell*, 382 U.S. 341, 352 (1966). See *Rose* v. *Rose, supra*; *Ridgway* v. *Ridgway*, 454 U.S. 46, 54 (1981); *McCarty* v. *McCarty*, 453 U.S. 210, 220 (1981).

The PKPA represents Congress's response to the "large and growing number of cases annually involving disputes between persons claiming rights of custody and visitation of children under the laws, and in the courts, of different states." Pub. L. No. 96-611, § 7(a)(1), 94 Stat. 3568 (1980). The abundance of these cases, Congress found, when combined with the often inconsistent and conflicting laws of various States regarding jurisdiction over child custody disputes, resulted in "the failure of the courts of [various] jurisdictions to give full faith and credit to the judicial proceedings of . . . other jurisdictions, the deprivation of rights of liberty and

property without due process of law, burdens on commerce among . . . jurisdictions and with foreign nations, and harm to the welfare of children and their parents and other custodians." Pub. L. No. 96-611, § 7(a)(4), 94 Stat. 3569 (1980). Accordingly, Congress enacted the PKPA in an effort to "establish national standards under which the courts of [various] jurisdictions will determine their jurisdiction to decide [child] custody disputes." *Id.* at § 7(b). See generally *Thompson* v. *Thompson*, 484 U.S. 174, 180-187 (1988).

There can be little doubt that Congress' expressed interests of furthering comity between States, protecting the right to be free from the deprivation of liberty or property without due process of law, lessening the burden on commerce between States and foreign nations, and preventing harm to the welfare of children and their parents are "clear and substantial federal interests" within the United States Supreme Court's preemption analysis described above. The primary point of contention in this case concerns the degree of interference which the 1987 amendment to G. L. c. 209B, § 11 (*b*), creates with these Federal interests, and whether this interference, if any, "sufficiently injure[s] the objectives of the federal program to require nonrecognition [of the amendment]." *Hisquierdo* v. *Hisquierdo, supra* at 583. A brief overview of the structure of the PKPA is in order.

The PKPA sets out several standards by which a State court may initially exercise child custody jurisdiction consistently with the over-all scheme of the PKPA. 28 U.S.C. § 1738A(c) (1982). The PKPA also sets out guidelines under which a State court with initial jurisdiction pursuant to the PKPA will maintain continuing jurisdiction over a child custody dispute. 28 U.S.C. § 1738A(d) (1982). Finally, and most importantly for the purposes of this case, the PKPA declares that "[a] court of a State shall not exercise jurisdiction in any proceeding for a custody determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section

to make a custody determination." 28 U.S.C. § 1738A(g) (1982).

There is no allegation that New Hampshire has failed to meet the requirements of the PKPA in exercising jurisdiction over the issue of Sean's custody. Therefore, the Probate and Family Court acted entirely in keeping with the PKPA when it stayed the divorce proceedings in Massachusetts in deference to the pending proceedings in New Hampshire. The argument is raised by the plaintiff, however, that the PKPA's requirement that Massachusetts not exercise jurisdiction over "any proceeding for a custody determination" regarding Sean does not conflict with the Massachusetts amendment providing for a probable cause hearing; the argument is that such a hearing would not implicate a "custody determination" within the meaning of the PKPA. The probable cause hearing, plaintiff argues, would at most prevent a Massachusetts court from exercising the power it would otherwise enjoy under G. L. c. 209B, § 11, to order a particular child to appear before a court of another State. The PKPA, it is noted, does not *require* Massachusetts to order an appearance in pending custody proceedings in another State. Such an order lies within the discretion of the Massachusetts court. See G. L. c. 209B, § 11. Consequently, the argument concludes, there is no "direct conflict" between the amendment and the PKPA, and, therefore, no preemption. We disagree. While this argument is correct in so far as it discusses the technical requirement of the PKPA, it completely fails to address the consequences a probable cause hearing could have on the "objectives of the federal program." *Hisquierdo* v. *Hisquierdo, supra* at 583.

When enacting the PKPA, Congress set out six "general purposes," at least four of which are relevant to our present discussion. These four purposes are as follows: To "(1) promote cooperation between State courts to the end that a determination of custody and visitation is rendered in the State which can best decide the case in the interest of the child; (2) promote and expand the exchange of information and other forms of mutual assistance between States which are

concerned with the same child; (3) facilitate the enforcement of custody and visitation decrees of sister States; [and] (4) discourage continuing interstate controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child." Pub. L. No. 96-611, § 7(c), 94 Stat. 3569 (1980).[3] It is our opinion that the operation of the 1987 amendment would serve to interfere substantially with the attainment of these purposes, thereby "sufficiently injur[ing] the objectives of the federal program to require nonrecognition [of the amendment]." *Hisquierdo* v. *Hisquierdo, supra* at 583.

We can think of no better illustration of interference with the intention of the Congress than is shown by the procedural history of this case. Under the 1987 amendment, if a Massachusetts court determines that probable cause exists to believe that a child may be placed in jeopardy or exposed to a risk of mental and physical harm, that court is precluded from ordering the child to appear in a pending custody proceeding in another State. Such a prohibition would exist irrespective of the fact that the other State's court might consider the child's presence crucial to an appropriate custody determination. This result would be clearly contrary to Congress's intent that courts of different States engage in "mutual assistance." The prohibition would also apply even though the other State court was clearly in a better position than any Massachusetts court to determine the child's best interests. In this manner, the 1987 amendment creates a serious obstacle to Congress's intent to "promote cooperation between State courts to the end that a determination of custody and visitation is rendered in the State which can best decide the case in the interest of the child."

---

[3]The two other purposes of the PKPA are: To "avoid jurisdictional competition and conflict between State courts in matters of child custody and visitation which have in the past resulted in the shifting of children from State to State with harmful effects on their well-being; and" "deter interstate abductions and other unilateral removals of children undertaken to obtain custody and visitation awards." Pub. L. No. 96-611, § 7(c), 94 Stat. 3569 (1980).

Even if a Massachusetts court determined that no probable cause existed and eventually ordered a child to appear in another State's court, the purposes of the PKPA would be frustrated. Congress intended the PKPA to "discourage continuing interstate controversies over child custody in the interest of greater stability of home environment." A probable cause hearing will take time. See *Umina* v. *Malbica*, 27 Mass. App. Ct. 351, 361 (1989) (discussing the possible need for argument, presentation of evidence, and live witnesses in a probable cause hearing pursuant to G. L. c. 209B, § 11 [*b*], second par.)[4] And stability in home environment is likely to become rare when a child's custody determination remains temporary and subject to change while the court capable of rendering a permanent custody decision is hobbled in its efforts by the absence of the child due to an ongoing probable cause hearing in Massachusetts. We need go no further than the facts of the present case to encounter such a situation. Such a result is at odds with the aims of the PKPA.

Finally, we note that the 1987 amendment would serve to frustrate the over-all purpose of the PKPA to encourage comity between States. See *Thompson* v. *Thompson*, 484 U.S. 174, 180-187 (1988). We see no reason to believe that New Hampshire courts are any less concerned than courts of the Commonwealth with the welfare of children who are the subjects of custody disputes. Nor do we perceive any less ability on the part of New Hampshire to protect adequately children under its jurisdiction than is available in the Commonwealth.[5] The assumption of the 1987 amendment that

---

[4]Liisa argues that the Appeals Court, through its opinion in *Umina* v. *Malbica*, 27 Mass. App. Ct. 351 (1989), has disposed of the issue now before us in favor of the constitutionality of the 1987 amendment. We disagree. While the opinion in *Umina* v. *Malbica* addresses the issue of the evidentiary procedures to be utilized in a hearing pursuant to the second par. of G. L. c. 209B, § 11 (*b*), the Appeals Court did not consider the constitutionality of the statutory amendment. Indeed, the Appeals Court specifically notes that "[c]onstitutional issues are not involved" in the issues the court addressed in its opinion. *Id.* at 354.

[5]We note that a Massachusetts court which believes that a child is at risk remains free to express its concerns to a court of another State which

other States' courts will be unwilling or unable to protect children in custody disputes is unwarranted.

We conclude that in order to "prevent the frustration and erosion of the congressional policy embodied in the federal [law]," the 1987 amendment to G. L. c. 209B, § 11 (*b*), is preempted by the PKPA. *Ridgway* v. *Ridgway, supra* at 54. Accordingly, our answer to the reported question is in the affirmative. The decision of the Probate and Family Court is affirmed.

*So ordered.*

---

enjoys jurisdiction over the child's custody. See G. L. c. 209B, § 7 (*c*); *Custody of Brandon, ante* 1, 5 n.3 (1990).