**KATHLEEN MASANI COX, Plaintiff,**

**v.**

**EUGENE JOSEPH PASLOV, Defendant.**

High Court of American Samoa
Trial Division

DR No. 115-00

July 17, 2001

Before KRUSE, Chief Justice, ATIULAGI, Associate Judge, and SAGAPOLUTELE, Associate Judge.

Counsel: For Plaintiff, David M. Wagner
 For Defendant, Marie A. Lafaele

## OPINION AND ORDER

### Introduction

The petitioner mother Kathleen Cox ("Petitioner" or "the mother") requests that we modify a Montana state custody decree ("Montana decree") and designate her exclusive custodian of the six-year-old minor child ("Minor" or "the child") of Petitioner and respondent father Eugene Joseph Paslov ("Respondent" or "the father"), who are not now married. The Montana decree modified an earlier Oregon state court parenting plan by granting custody of Minor, previously with Petitioner, to Respondent. On November 22, 2000, Petitioner filed this motion to modify and, on December 21, 2000, served it upon Respondent. Trial commenced on April 5, 2001, with both parties present and represented by counsel. Both parties subsequently filed written closing arguments. Threshold to deciding the merits of Petitioner's request is the issue of whether we have jurisdiction to alter another state court's custody decree. Upon careful consideration of the facts and law in this matter, we conclude that we may, and do, assert jurisdiction to modify the Montana

decree, and therefore, amend that decree as set out in further detail below.

## Facts

Petitioner and Respondent wed in 1991. Petitioner's two older children from a previous marriage, Diedre ("Diedre") and Warren Esteron ("Warren"), lived with the couple. Minor was born to the marriage on November 8, 1994. Since birth, the mother has been Minor's primary caretaker; since the parties' separation in 1996, she has been Minor's resident parent. Since separation, Respondent has had very little involvement in the Minor's day-to-day upbringing.

From its inception, the marriage was plagued with domestic troubles. Significantly, the Respondent abused drugs and exhibited aggressive tendencies towards the Petitioner and her children. Respondent admitted to using drugs "recreationally" early in the marriage but claims that he discontinued drug use in 1993 or 1994. According to Petitioner, Respondent regularly used drugs such as "crank," a form of speed, and cocaine at home. She was introduced to these substances by Respondent in the first two weeks of the marriage, and herself tried drugs with Respondent. She asserts that she has never used them since. Respondent was not very discreet about his drug use in the marital home. Warren testified that at the age of 11 or 12, he discovered what he now believes to be drugs in Respondent's bedroom drawer. Specifically, he found a plate with cocaine-like powder and cut-up straws. At another time, Warren saw drug paraphernalia in the home, and found three packets of the same cocaine-like substance in Respondent's bathroom drawer.

When Petitioner was gone on overnight work, Respondent was Minor's caretaker. Petitioner, who works as a flight attendant, frequently traveled interstate, which sometimes required her to "lay-over," or rest, in a neighboring state. On some of these occasions, Diedre and Warren would awaken at night from Minor's cries, only to find him alone in the room he shared with Respondent. Respondent apparently disappeared frequently at night, leaving Minor unattended.

Throughout their marriage, Respondent demonstrated an unpredictably violent temperament. For example, on one occasion, when Minor was a baby and was crying, Respondent, in frustration, hovered over him in his crib, shook the bed, and yelled at him to "shut up." Warren attempted to help, but Respondent refused, and shut him out of the room. Minor continued to wail.

In other incidents, Respondent demonstrated physical hostility. During an intense argument when Petitioner was nine months pregnant with

Minor, Respondent shoved Warren, aged 13 at the time, into a wall and grabbed him by the neck for attempting to intervene. On at least two other occasions, police responded to complaints of domestic abuse. Once in 1993, and again in 1995, police arrested and jailed Respondent for assaulting Petitioner. In the 1995 incident, Respondent broke Petitioner's wrist.

Soon thereafter, Petitioner and Respondent separated legally and geographically. In 1996, Petitioner relocated to Washington with her two children and Minor. At some point after Petitioner moved, Respondent transferred to Carson City, Nevada.

While living in Washington, Petitioner was able to provide for her children by continuing her work as a flight attendant. When required to work overnight, Petitioner left Minor with Diedre and Warren, who were then in their mid-teens. She would ensure that an adult friend supervised the children. Although apart, Petitioner continued to send Minor to visit Respondent without incident. Petitioner provided Minor with air transportation through her employee flight benefits, and sent him to Nevada with one of her older children as an escort.

On February 12, 1999, an Oregon state court simultaneously granted Petitioner and Respondent an uncontested divorce, provided Petitioner sole legal and physical custody of Minor, and adopted the parties' agreed-upon visitation schedule ("Oregon parenting plan"). (Ex. 7, *In re the Marriage of Paslov v. Paslov*, No. C96-1936 DR, slip op. at 2-3 (Or. Cir. Ct. Feb. 12, 1999).) Specifically, the Oregon parenting plan provided Respondent with supervised visitation at least one weekend a month, one month during the summer, and alternating holidays. Further, the plan specifically outlined the method for implementing Respondent's visits. Visits were to take place at Minor's paternal grandparent's home in Carson City, Nevada, to which Minor had to travel by air, chaperoned by Petitioner or one of her two older children. Respondent was responsible for the cost of air transportation, and suffered to lose his parenting time if he failed to pay for Minor's airfare. Finally, if Respondent wished to visit with his son in the summer, he was required to notify Petitioner of his intended summer schedule no later than May 1st of each year.

Since the issuance of the Oregon parenting plan, Respondent visited sporadically with Minor. In April 1999, Respondent visited with Minor for about nine to ten days. Then, in September 1999, Petitioner sent Minor, escorted by one of her older children, to Reno, Nevada, where Respondent then lived with his parents. Minor spent three weeks there. During the holiday season, from December to January, Minor again spent three weeks with Respondent.

154

In 1999, Petitioner decided to relocate from Washington to Butte, Montana, to live with her fiancé, Don McGee ("McGee"), whom she planned to wed in July 2000. It appears that at least by late December 1999, Petitioner finalized her move to Montana (Petitioner maintained a lease on a Seattle, Washington apartment until December 31, 1999.). The father, aware of the mother's plans to relocate, but ignorant of her proposed marriage, did not initially object. However, soon after Minor's Christmas-New Year sojourn in Nevada, at which time Minor revealed the mother's nuptial plans, the father became obsessively concerned with the possibility of another father figure in his son's life, and very resentful, if not outright jealous, over Petitioner's proposed remarriage.

Respondent unpersuasively claims that he objected to Minor's transfer to Montana, having lost all contact with Minor upon Minor's mid-January return. In fact, before telephone service had even reached their new home, Petitioner had given Respondent Minor's Montana address. On the pretext of searching for Minor, but for the apparent purpose of harassing Petitioner, Respondent retained a Montana attorney and private investigator. On March 14, 2000, while McGee and Minor were having breakfast at the War Bonnet Inn in Butte, Montana, they were approached by Respondent, Respondent's mother, and a private investigator. McGee testified that with Minor nearby, Respondent glared at him and told him to leave Petitioner because "she's an evil bitch." McGee reluctantly allowed Minor to visit with Respondent for 24 hours. Through Respondent's counsel and investigator, the parties attempted a later mediation with Respondent's mother, counsel, and investigator, with McGee present. The meeting resulted in Petitioner's assistance in providing Minor with specific telephone access to contact Respondent. However, for no clear reason, the parties' effort at resolution failed, and communication between the parties deteriorated further.

On April 3, 2000, Respondent petitioned a Montana court to recognize and register the Oregon parenting plan, and modify the same. In particular, Respondent asked that Petitioner remain Minor's sole custodian, but that the court modify the Oregon parenting plan to provide for 1) increased visitation; 2) reinstatement of Minor's travel benefits; 3) specific telephone and e-mail access; 4) process for affecting Minor's residential changes; and 5) other general parental duties.[1] On May 18, 2000, Petitioner acquiesced to the Montana court's jurisdiction, but objected to any modification of the Oregon parenting plan. On May 22, 2000, Judge Ted L. Mizner of the Montana Third Judicial District Court of Powell County ("Judge Mizner") registered and asserted jurisdiction over Oregon's plan.

---

[1] Respondent also requested amendment to child support obligations, not at issue in this case.

Respondent continued to be in contact with Minor. He kept Minor for a weekend in May, and began negotiating with Petitioner for his summer parent-child contact. Because Petitioner and McGee scheduled to wed on June 24, 2001, the parties agreed to schedule Respondent's summer visit with Minor to June 26, 2001. According to Petitioner, the parties had agreed to exchange Minor at the Tacoma International Airport in Seattle, Washington. However, on June 22, 2000, four days before the scheduled visit in Seattle, Respondent somehow managed to track down Petitioner while she shopped for things for her wedding at a Wal-Mart in Butte, Montana. He accosted Petitioner and made a public spectacle of himself. Accusing Petitioner of concealing Minor, he ranted and raved in the store, quite oblivious to the attention he was attracting, calling Petitioner, among other things, an "evil adulteress cunt." He further told her that he was going to ruin her wedding, stalk her for the remainder of her life, harm her and her children, and make the rest of her years miserable.

Respondent, incredibly, claims that despite the bizarre altercation, Petitioner promised him a visit with his son at the Ramada Inn Hotel in Butte, Montana, at 12:00 p.m. on June 26. The facts show that Petitioner instead immediately petitioned Justice of the Peace Mel Mooney of SilverBow County ("Judge Mooney") for a temporary order restraining Respondent from contact with Petitioner and certain family members, including Minor. On June 26, 2000, Respondent was served with the restraining order. Respondent's counsel immediately contacted Judge Mooney and explained that an ongoing custody proceeding was pending before Judge Mizner in another county. Judge Mooney rescinded the order as to Minor, explaining that it had not been his intent to supersede the current custody order, and ordered that the parties follow the then governing custody order.

Not aware of the order's rescission, and fearing for her and her children's safety, Petitioner cancelled her wedding, and left Montana without informing Respondent of her or Minor's whereabouts. She thereafter moved to American Samoa. She and her children arrived in American Samoa on July 8, 2000.

Meanwhile, court proceedings concerning Petitioner and Minor continued in Montana. On August 1, 2000, Respondent, still uninformed as to Minor's whereabouts, amended his motion to modify the Oregon parenting plan requesting sole custody of Minor, and Petitioner's supervised parent-child contact, and psychological evaluation.

On August 2, 2000, Justice of the Peace Kevin A. Hart of Anaconda-Deer Lodge County issued a criminal warrant for Petitioner's arrest on the charge of parenting interference. (Ex. 7., *State of Montana v. Cox*,

156

No. 00-21331 (Mont. J.P. Ct. Aug. 2, 2000) (warrant of arrest).) The basis for the charge was Petitioner's thwarting of Respondent's summer visitation rights. *Id.* Then, on September 11, 2000, after an *ex parte* evidentiary hearing, at which Petitioner was not in attendance, her knowledge of the hearing doubtful given her absence, and based solely on Respondent's distorted version of the facts,[2] Judge Mizner granted Respondent sole custody of Minor. *Paslov v. Cox*, No. DR00-28 (Mont. Dist. Ct. Sept. 11, 2000). Judge Mizner prohibited Petitioner from parent-child contact with Minor "until such time as she submits to, and completes, a full psychological evaluation, to be administered by a licensed therapist." *Id.* at 2. Judge Mizner awarded Respondent reasonable attorney fees and costs and terminated Respondent's child support obligations as of the date of the order. *Id.*

Since moving to American Samoa, Petitioner has been seeing a therapist. As stated earlier, on November 22, 2000, she filed this action to modify Montana's decree which gave Respondent sole custody of Minor. Then, on December 21, 2000, Respondent was served. In February 2001, Respondent arrived in American Samoa and solicited at least three supervised visits with Minor.

Currently, no one lives in Montana. Petitioner, who was born and raised in American Samoa, testified that she had always intended to return to American Samoa and make it her permanent home. Although Respondent provoked her early return, she intends to continue to reside in American Samoa. Petitioner, Diedre, and Minor live with Petitioner's mother, a native Samoan, in Pavai`ai, American Samoa. Petitioner placed Minor in school. In February 2001, officials from Child Protective Services performed a home study of Minor's American Samoa home and approved it for purposes of his care.[3]

---

[2] Respondent accuses Petitioner of thwarting his visitation opportunities. However, it is quite clear from the evidence that Respondent's missed visits with Minor were due to his own failure to schedule or pay for Minor's transportation as mandated by the Oregon parenting plan. In fact, on occasions, Petitioner facilitated, rather than inhibited visits by providing air transportation for Minor through her employment benefits. And when she did not, she received haranguing email from Respondent's mother bemoaning Respondent's failure to provide for Minor's transportation costs, citing Respondent's unemployment.

[3] At a hearing held post-trial but before the issuance of this decision, on June 25, 2001, concerning the same matter, Petitioner's counsel advised the court that Petitioner is currently in Montana to face the charge of alleged parental interference. In the meantime, Minor continues in the care and custody of his maternal grandmother and Deidre.

Respondent now resides in Reno, Nevada. While his ability to maintain employment has been unsteady, he is currently employed as a waiter at an Olive Garden Restaurant and claims to work part-time helping out his father's business.

## Discussion

■ For the first time, this Court is asked to modify another state's custody decree in accordance with the Parental Kidnapping Prevention Act, 28 U.S.C.A. § 1738A ("PKPA").[4] In an effort to provide a uniform federal standard for dealing with national controversies over child custody jurisdiction, Congress enacted the PKPA in 1980.[5] The PKPA was clearly intended to preempt state and territorial law regarding the modification of child custody orders.

> [I]t is necessary . . . to establish national standards under which the courts of such jurisdictions [the states] will determine their jurisdiction to decide such [custody] disputes and the effect to be given by each such jurisdiction to such decisions by the courts of other such jurisdictions.

*Id. See also Voninski v. Voninski*, 661 S.W.2d 872, 876 (Tenn. Ct. App. 1982) (under the Supremacy Clause of the United States Constitution, the PKPA entirely preempts state child custody law); *Curtis v. Curtis*, 789 P.2d 717, 721 (Utah Ct. App. 1990); *Archambault v. Archambault*, 555 N.E.2d 201, 206 (Mass. 1990).

■ The PKPA requires that we give the Montana decree full faith and credit if it was made consistently with the provisions of the statute. 28 U.S.C.A. § 1738A(a). We need not reexamine Montana's jurisdiction over the Oregon plan. The parties were both before the Montana Court and assented to Montana's jurisdiction when the court considered the question and determined its exercise of jurisdiction appropriate. *See Jordan v. Jordan*, 586 A.2d 1080, 1083 (R.I. 1991) (refusing to revisit jurisdiction determination because the preliminary question was litigated in an adversarial proceeding). We extend full faith and credit to the Montana decree; the next issue is then, whether the PKPA permits our modification of the decree.

---

[4] Petitioner also asks that we modify the Montana custody decree in accordance with the Uniform Child Custody Jurisdiction Act of 1968 ("UCCJA"). However, while the majority of states and territories have enacted the UCCJA, or its equivalent, American Samoa has not.

[5] The PKPA applies to American Samoa where the act defines "state" as including "a territory or possession of the United States." 28 U.S.C.A. § 1738A(b)(8).

■ To modify another state's decree, the PKPA provides a two-part test, which we apply as follows: 1) did the rendering state lose or refuse jurisdiction; and 2) does the modifying state now have jurisdiction. 28 U.S.C.A. §§ 1738A(f)(1), 1738A(f)(2).[6]

A. Montana's Jurisdiction

■ There are two ways that a rendering court may retain jurisdiction. First, under subsection (d) of the PKPA, if certain requirements are met, the initial court may have "continuing jurisdiction." Second, under subsection (g) of the PKPA, if the matter before the initial court is not yet final, it may have "pending jurisdiction" over the case.

*1. Continuing Jurisdiction*

■ For a period after a state issues an initial decree, that state continues to have jurisdiction so long as certain PKPA requirements are satisfied. According to this test, the jurisdiction of a rendering state is exclusive as long as it satisfies two requirements: 1) the residence of the child or of any contestant remains in the rendering state; and 2) the rendering state has jurisdiction under its own laws. During this period of what is often termed "continuing jurisdiction," other states or territories must enforce and cannot modify the initial custody determination.[7]

---

[6] The PKPA provides in pertinent part:

Full faith and credit given to child custody determinations
(a) The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsection[ ] (f) . . . of this section, any [child] custody determination . . . made consistently with the provisions of this section by a court of another State.

\* \* \*

(f) A court of a State may modify a determination of the custody of the same child made by a court of another State, if —
(1) it has jurisdiction to make such a child custody determination; and
(2) the court of the other State no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify such determination.

28 U.S.C.A. § 1738A(a), (f).

[7] PKPA subsection (d) states:

The jurisdiction of a court of a State which has made a child custody . . . determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.

None of the participants live in Montana. Petitioner and Minor relocated to American Samoa on July 8, 2000, with the intent to remain and make American Samoa their home. Respondent currently resides in Nevada. *See, e.g., Dahlen v. Dahlen*, 393 N.W.2d 765, 768 (N.D. 1986) (no continuing jurisdiction under PKPA to modify custody decree where no participants to custody dispute continued to reside in state).

### 2. Pending Jurisdiction

■ The PKPA further provides that a state court has exclusive jurisdiction if the matter before it is pending. 28 U.S.C.A. § 1738A(g).[8] This condition is designed generally to apply to situations in which no custody determination has yet been made on a matter before another state court. *See In re Brandon*, 551 N.E.2d 506, 509 (Mass. 1990). More specifically, a matter is "pend[ing]" for purposes of the PKPA at any point before the final custody order is made and the time for appeal expires. *Id.*

In this case, Montana has made a final custody determination. On September 11, 2000, Montana transferred Minor's custody to Respondent, the nonresident parent. Furthermore, the period to appeal that decision has expired.[9]

■ Respondent further argues that Montana's jurisdiction is "pending" because an enforcement action against Petitioner is proceeding in Montana. A similar fact situation presented itself in *In re Brandon*. There the court distinguished a "pending" custody determination from a contempt proceeding, which had been spurred by an alleged violation of one parent's visitation rights. Although an enforcement action was outstanding in another court, the *Brandon* court held that that court had

---

28 U.S.C.A. § 1738A(d). PKPA subsection (c)(1) states, in pertinent part:
> A child custody . . . determination made by a court of a State is consistent with the provisions of this section only if (1) such court has jurisdiction under the law of such State.

28 U.S.C.A. § 1738A(c)(1).

[8] PKPA subsection (g) states:
> A court of a State shall not exercise jurisdiction in any proceeding for a custody . . . determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody determination.

28 U.S.C.A. § 1738A(g).

[9] Montana Rules of Appellate Procedure Rule 5(a)(1) allows parties 30 days to appeal a custody determination.

resolved the question of custody, and therefore, the matter was no longer "pending."

Likewise, in the present case, the current Montana arrest warrant and criminal proceeding against Petitioner for an alleged visitation violation is distinct and separate from Montana's custody determination and, therefore, is no longer "pending" within the meaning the PKPA. With neither "continuing" nor "pending" jurisdiction, Montana lost jurisdiction. We next determine whether we may exercise jurisdiction.

## B. American Samoa's Jurisdiction

█ The second prong of the PKPA modification test requires that the modifying territory have jurisdiction as defined by its own laws. American Samoa lacks statutory authority in the form of a UCCJA. However, this court exercises jurisdiction and modifies foreign custody decrees where the child in question is present in the territory. *See, e.g., In the Matter of Minor Child*, 28 A.S.R.2d 31 (Trial Div. 1995). *See also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 79(b) (1971).[10]
We hold that we may exercise jurisdiction over Minor's custody because Minor is present in the territory, and, in fact, has been present in American Samoa for the past year. Nonetheless, because we have yet to enact our own version of the UCCJA, we turn again to the PKPA to ensure that our exercise of jurisdiction is consistent with its terms. *See Green v. Bruenning*, 690 S.W.2d 770, 771 (Ky. 1985) (adopting PKPA to determine state jurisdiction where state had not adopted the UCCJA).

█ The PKPA provides four jurisdictional bases including: 1) home state jurisdiction; 2) significant connection jurisdiction; 3) emergency jurisdiction; and 4) default jurisdiction. 28 U.S.C.A. §§ 1738A(c)(2)(A)-(D).

█ We need not consider each basis, and may premise our jurisdictional determination upon just one. *See Evans v. Evans*, 668 F. Supp. 639, 641 (M.D. Tenn. 1987) (court must meet at least one of the jurisdictional touchstones of PKPA to modify another state's custody determination). Under the third enumerated condition, we have jurisdiction if:

> the child is physically present in such State and . . . it is necessary in an emergency to protect the child because [he] has

---

[10] The *Restatement* states in relevant part: "A state has power to exercise judicial jurisdiction to determine the custody . . . of a child . . . who is present in the state." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 79(b).

been subjected to or threatened with mistreatment or abuse[.]

28 U.S.C.A. § 1738A(c)(2)(C).

 The circumstances in this case clearly create an emergency substantial enough to confer upon this court jurisdiction to protect Minor from Respondent. This Court, unlike the Montana Court, had the benefit of an *inter partes* adversarial trial. The evidence before us clearly shows that Respondent has a history of drug abuse and a demonstrated propensity for violence. Furthermore, Respondent's recent pattern of hostility towards Petitioner because of her proposed marriage culminating in the incident at the Montana Wal Mart, makes evident Respondent's current instability and inability to cope with certain realities, namely Petitioner's plan to remarry. We are not satisfied that Minor will not be subjected to these harms while in Respondent's primary care and, therefore, exercise jurisdiction to protect the child's best interest.

C. Custody

 Noting jurisdiction, and taking into consideration all of the factors in this case, we modify the Montana decree to provide Petitioner sole and exclusive custody of Minor. We have previously expressed the circumstances to consider in custody situations as follows:

> [O]ther things being equal, children of tender years should remain together and their custody given to the mother. The mother is the natural custodian of her young. There is no satisfactory substitute for her love. Other things being weighed and considered are a good home, congenial surroundings, and intelligent attention and direction in matters affecting the health, education, growth and development of the children.

*Stevens v. Stevens*, 21 A.S.R.2d 76, 78-79 (Trial Div. 1992) (citations omitted). Historically, Petitioner has been primarily responsible for Minor's upbringing and day-to-day needs. The evidence shows that the mother has continued to provide Minor with a stable and nurturing environment. While managing single parenthood, the mother has maintained gainful employment; the father has not. In addition, the mother has a proven record of accomplishment with raising children, having successfully reared Minor's two older siblings. Perhaps as significant a factor is Minor's continued interaction with his two older siblings, who have both actively participated in Minor's upbringing and care. Currently, Diedre and the child reside with the mother. While we do not doubt a father's love for his son, this father's commitment towards his parental obligations is far outweighed by the mother's in this case.

When married, the father left the child unattended at night in the mother's absence, openly abused drugs, and demonstrated an uncontrollable temperament. Since the separation and divorce, he has inconsistently invoked his visitation rights, and has had to rely on his ex-wife for assistance. Furthermore, we have not had the benefit of any evidence as to the father's ability to provide for the child's day-to-day care such as a stable home environment and educational needs. From what can be gleaned from the father's circumstances, he appears seriously dependent on his own parents to provide for the child's needs, especially since all of Respondent's visits with Minor have taken place at the paternal grandparent's home. Moreover, the record before us is scant as to the paternal grandparents' circumstances in terms of their ability and willingness to furnish day-to-day assistance beyond intermittent visits as in the past. The Court is not convinced of the father's suitability for sole custody given his background with drug abuse coupled with his aggressive nature. At the same time, we are troubled with the very clear impression that Respondent's motivation and primary purpose in this whole sorry affair has not so much been the best interests and welfare of the Minor, but rather the detriment of his mother. We conclude, therefore, that it would be in Minor's best interest that custody be reestablished with the Petitioner.

### Order

1. Sole and exclusive custody of Minor is granted to Petitioner.
2. Temporary physical custody of Minor is granted to Minor's maternal grandmother until the conclusion of Montana criminal proceedings regarding the charge against Petitioner of alleged parental interference.

3. Reasonable visitation, supervised by a Department of Human and Social Services Child Protective Services officer or representative, is granted to Respondent.

It is so ordered.