NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1169                                           Appeals Court

ROBERT AND ARDIS JAMES FOUNDATION & another[1]  vs.  DANIEL MAXWELL
                            MEYERS.


                        No. 13-P-1169.

     Suffolk.     March 14, 2014. - February 12, 2015.

          Present:  Cohen, Graham, & Grainger, JJ.


Contract, Implied covenant of good faith and fair dealing.
     Damages, Breach of contract, Sale of stock.  Corporation,
     Stock.



     Civil action commenced in the Superior Court Department on
November 16, 2006.

     After transfer to the business litigation session, the case
was heard by Christine M. Roach, J.


     Kevin P. Martin (Katherine Sadeck with him) for the
defendant.
     Joseph L. Bierwirth (Thomas J. Carey, Jr. with him) for the
plaintiffs.


     GRAHAM, J.  This action arose out of two one-page letter

agreements (letter agreements or agreements) between plaintiff

_____

     [1] Robert James.

Robert James and the defendant, Daniel Maxwell Meyers,[2] in which James agreed to provide Meyers with $653,340 for the purchase by Meyers of 31,107 shares of stock in the First Marblehead Corporation, a company cofounded by Meyers. In exchange for supplying Meyers with the funds, James would receive the right to participate in the proceeds of the sale of the 31,107 shares. However, notably absent from each letter agreement was any provision governing its termination or establishing conditions upon which Meyers would be required to sell their stock.[3]

In the fall of 2004, James's daughter, Catherine James Paglia (Catherine[4]), seemingly on behalf of the James family, inquired of Meyers, seeking termination of the agreements. Meyers declined and, on November 16, 2006, the plaintiffs filed a multicount complaint in Superior Court, later amended, asserting claims for division and distribution of the shares (count I), dissolution of a partnership or joint venture (count

---

[2] Another signatory to the letter agreements was Stephen Anbinder, discussed infra.

[3] The funds were drawn not from James's personal accounts, but from plaintiff the Robert and Ardis James Foundation (foundation), a charitable entity for purposes of the Internal Revenue Code, organized under the laws of New York, whose purpose is to make qualifying charitable donations of the accumulated funds. During the relevant time periods of this lawsuit, the trustees of the foundation were plaintiff James, his wife (Ardis James), and his two children, Ralph James and Catherine James Paglia.

[4] For clarity, we employ first names when referring to James's children.

II), declaration of an agency relationship (count III), breach of an implied term of the contract (count IV), breach of the implied covenant of good faith and fair dealing (count V), payment of a share of the dividends (count VI), and declaratory judgment (count VII).

After a six-day bench trial in April, 2011, the trial judge found in favor of Meyers on counts I through IV and VI.  She did, however, determine that on July 31, 2006, Meyers breached the implied covenant of good faith and fair dealing (count V).  The judge awarded the plaintiffs damages based on the fair market value of the shares of the stock as of the time of the breach.  With interest, the damages awarded were $44,052,678.[5]

The trial judge subsequently denied Meyers's motion for reconsideration as well as the plaintiffs' motion to amend the judgment in their favor on counts II, IV, and VI.  The central issue on appeal is whether Meyers breached the implied covenant of good faith and fair dealing.  We conclude that he did not and, accordingly, reverse.

Facts.  We summarize the facts from those agreed-upon, and the judge's extensive findings.  Additional undisputed facts are supplied for context.

_____

[5] The amended judgment included a declaration (count VII) that Meyers must reimburse the foundation for the fair market value of the foundation's "share of the subject stock" on July 31, 2006, with interest to April 15, 2011, the date of the close of evidence at trial.

Meyers is a 1984 graduate of Brandeis University, with an undergraduate degree in economics. He worked in the financial services industry for the next seven years. In 1991, he and Stephen Anbinder founded First Marblehead LP, a provider of higher education private student loan origination and services.

Meyers served as the managing partner of First Marblehead LP. In 1995, upon incorporation, First Marblehead Corporation (First Marblehead) was a privately held Delaware corporation with its headquarters in Massachusetts, and Meyers became its chief executive officer (CEO) and chair of the board of directors, positions he held through 2005. On October 31, 2003, First Marblehead offered its common stock to the investing public in an initial public offering (IPO), and its shares have been traded on the New York Stock Exchange since that date.

James, eighty-six years old at the time of trial, is a professional investor with more than forty years of experience investing in various business ventures. He graduated from Harvard Business School, and later earned a Ph.D. in economics from Harvard. James taught economics and business organization at the Massachusetts Institute of Technology (MIT) and was involved in the creation of MIT's Sloan School of Management. In 1969, he and a friend formed Enterprise Asset Management, Inc. (EAM), a highly successful investment firm with offices on

Fifth Avenue in New York City. EAM has interests in diverse businesses and industries throughout the world.[6]

James became familiar with Meyers through his children's involvement with First Marblehead. Catherine, a former vice president at Morgan Stanley & Company, had been a principal in Interlaken Capital (Interlaken), a private equity firm. Interlaken made an investment in First Marblehead in the mid-1990s, as did Catherine and other Interlaken partners.

Catherine introduced her brother Ralph James to Meyers in the mid-1990s. In 1995, Meyers hired Ralph as executive vice president of First Marblehead. Subsequently, Ralph held the position of president and chief operating officer. In 2004, he was elected vice chair of First Marblehead's board of directors.

In approximately 1997, Meyers developed a personal relationship with James and the two met several times a year in James's New York office and at the New York Yacht Club. They also took several leisure trips together. James considered the First Marblehead business plan "quite a brilliant thing." He also contacted one of the larger investors in First Marblehead who assured James that "this guy [Meyers] knows what he is doing."

---

[6] EAM invested in a wide range of businesses and industries including shopping centers, oil and gas, the sale of French wine in China, and villa construction in India. At his pretrial deposition, James estimated his net worth in the hundreds of millions of dollars.

In November, 1997, James made his initial investment in First Marblehead.  Meyers wanted to purchase a leisure boat and, to fund the purchase, he sold 10,000 shares of his privately held common stock in First Marblehead to James at thirty-six dollars per share.[7]  The $360,000 investment was "relatively modest" by James's standards.

The following year, James and Meyers entered into the first of the two letter agreements that are at the heart of this litigation.  On January 22, 1998, First Marblehead issued a letter offering its shareholders the opportunity to purchase additional shares of First Marblehead stock in a rights offering (the 1998 rights offering) at a price of twenty dollars per share up to a maximum number of shares commensurate with the shareholder's existing percentage ownership of First Marblehead. Meyers was given the right to purchase up to 18,627 shares, Anbinder up to 13,161 shares, and James up to 941 shares. Meyers and Anbinder were not in a financial position to participate in the 1998 rights offering and were concerned that it would dilute their percentage ownership of First Marblehead. James personally participated in the 1998 rights offering, purchasing the maximum number of shares allowed.

---

[7] James later sold the shares and those accumulated from stock splits of the original 10,000 shares, and earned a profit in excess of $24 million.

Meyers sought and obtained agreement from James that James, through the foundation, would provide the money required for Meyers and Anbinder to purchase the shares in their own names in exchange for James's right to share in the proceeds of the sales in the future.  Meyers sent James a draft agreement regarding the proposed purchase of First Marblehead stock and, after some discussion, the parties reached agreement.  The entire content of the letter agreement (the 1998 agreement) signed by James on February 20, 1998, was as follows:

"Dear Bob:

"This letter will confirm our agreement regarding the purchase of common stock of The First Marblehead Corporation in the current rights offering by Steve Anbinder and me.

"We have agreed that Steve and I will exercise our rights to purchase 18,627 and 13,161 shares, respectively, of stock @ $20.00 per share and that you will advance the funds to each of us in return for the right to participate in the proceeds of sales.  The total of the advances will be $635,760.  The advances will be without recourse and will be repaid solely out of proceeds when the stock is sold.

"Steve and I will take title to the stock in our own names. Each of us will deliver the newly-issued share certificate[s] to you, and you will retain the certificates in your possession until the stock is sold.  You may also vote the stock as you see fit.

"Upon the sale of the stock, you will be entitled to the sale proceeds up to a sale price of $30 per share.  The balance of the sale proceeds, if any, will be divided 50% to you and 50% to either Steve or me.  Either Steve or I may assign all or part of our interest to a third party.

"If this letter accurately reflects the terms of our agreement, I ask that you sign the duplicate copy of the letter and return it to me."

First Marblehead's outside counsel, Attorney Rodney G. Hoffman, had drafted the agreement and represented Meyers. Anbinder had been added as a signatory to the final 1998 agreement.[8] James wired $635,760 of foundation funds for the purchase of stock pursuant to the 1998 agreement, which included $372,540 for the purchase of 18,627 shares by Meyers and $263,220 for the purchase of 13,161 shares by Anbinder.[9]

In a letter dated January 25, 1999, the parties executed an almost identical letter agreement (the 1999 agreement) in connection with another rights offering (the 1999 rights offering). James directed the foundation to provide Meyers and

---

[8] There were three material differences between the draft and the final 1998 agreement:  (1) the economics of the final 1998 agreement moved in James's favor, providing him with ten dollars per share higher appreciation in value of the stock price from the date of the 1998 agreement before James needed to divide proceeds from the sale of the stock to Meyers and Anbinder, (2) James acquired the right to vote the shares, and (3) the language in the draft permitting James to hold the certificates "until such time as [they] agree that the stock should be sold" was deleted.

[9] Sometime after the 1998 agreement, Meyers and Anbinder sent an undated letter to Ralph confirming the purchase of the additional shares.  In that letter, Meyers and Anbinder each assigned to Ralph a one-half interest in the proceeds of the sale of the stock purchased under the 1998 rights offering, in recognition of Ralph's hard work and good contributions to First Marblehead.  The assignment by Meyers and Anbinder to Ralph subsequently was converted into an option agreement and exercised by Ralph, resulting in substantial personal gain.

Anbinder $479,205; Meyers purchased 12,480 shares of First Marblehead stock and Anbinder purchased 8,818 shares. Between the two rights offerings, James advanced $1,114,965 of foundation funds to First Marblehead, $653,340 on behalf of Meyers.

First Marblehead was highly successful and the value of its stock increased dramatically. On August 25, 2003, the corporation effected a ten-for-one stock split of its shares. In October of 2003, First Marblehead effected a four-for-one stock split, and in December of 2006, it executed a three-for-two stock split. As a result of the stock splits, the 31,107 shares subject to the agreements had become 1,866,420 shares by the time of the trial in 2011.

Meyers left First Marblehead as CEO and chair of the board of directors on September 27, 2005.[10] On October 5, 2005, the board of directors declared a dividend to shareholders of twelve cents per share of common stock, paid quarterly. Because Meyers owned the shares subject to the letter agreements, he received and retained all of the dividends paid on those shares.

Nature of the dispute. In 2001, Catherine joined EAM as a director and began assisting her father with his financial

---

[10] In August, 2008, the board of directors asked Meyers to return, and he did so. We also note that James attempted, unsuccessfully, to contact Meyers during the period of 2005 to 2006.

affairs at EAM and the foundation. She spent several years making sure his investments were properly reflected on EAM and foundation records. Many documents were missing from the files of the foundation, including the 1999 agreement. On October 19, 2004, Catherine sent an electronic mail message (e-mail) to Meyers and Anbinder, seeking the voting proxy cards belonging to the foundation and asking them "to consider whether we can negotiate an equitable distribution of these shares between you and the Foundation so that this agreement can be terminated."[11]

Although Anbinder did not believe he had a duty to do so, he agreed to unwind his portion of the agreements.[12] On December 13, 2005, following months of negotiation, Anbinder and James reached agreement regarding the disposition of the First Marblehead shares of stock (Anbinder agreement). The Anbinder agreement gave Anbinder the right to receive fifty percent of the proceeds of the sale of his shares of First Marblehead stock pursuant to the agreements.[13] At the time of the Anbinder

---

[11] Meyers and Anbinder sent the proxies to Catherine and, on November 4, 2004, she thanked them for their prompt attention to her request.

[12] As a result of a succession of stock splits, the 21,979 shares of stock that originally were subject to the agreements had become 879,160 shares by April of 2005.

[13] The Anbinder agreement provided, in relevant part, that Anbinder and James "have now agreed to modify our agreement by distributing the 879,160 shares of stock in [First Marblehead] currently held by [James] . . . on a 50-50 basis as follows:

agreement, the stock price had increased to around twenty dollars per share (from about fourteen dollars per share in October of 2005). Thus, James's investment of $461,625 resulted in his receipt of $8,791,600, which was fifty percent of the proceeds from the sale of Anbinder's shares pursuant to the agreements.

Catherine expressed her satisfaction with the Anbinder agreement and felt that the deal was a very small economic concession on the part of the foundation.[14] Anbinder informed Meyers about the favorable terms of the deal, asking several times whether "he wanted to sit down and talk to the James family." Meyers answered, "Not particularly."[15]

---

439,580 shares would be distributed to the Foundation, and the remaining 439,580 shares would be retained by . . . Anbinder."

[14] Addressing the concession, James testified, "It should cost the Foundation to do this. I didn't know how long [Anbinder] would take and what he'd do. I was delighted, I would have paid more to get this thing done." Further explaining his motivation for wanting to sell the stock, James noted that First Marblehead was a "large value" stock, and the foundation lacked cash at that time to satisfy its legal obligation to pay out five percent of its investment assets. Catherine testified that in order to achieve her goal of getting rid of the letter agreements with Anbinder and Meyers, she understood that she might be required to sweeten the original terms.

[15] As stated supra, dividends on First Marblehead stock were paid quarterly beginning on October 5, 2005. At no time prior to this litigation did the plaintiffs assert any claim to the dividends paid on the stock shares at issue and, on appeal, the plaintiffs have not challenged the trial judge's finding that they were not entitled to these dividends.

In 2006, an inquiry by the Attorney General of New York prompted the foundation to hire a lawyer to advise it on matters relating to its tax-exempt status.[16]  That lawyer advised the foundation to "promptly take any and all actions required to secure the Foundation's fair share of the proceeds from the investment [in First Marblehead] so that such proceeds can be devoted to the charitable purposes of the James Foundation." The lawyer advised the foundation to take legal action against Meyers if he remained unwilling or unable to cooperate.

In a letter dated July 10, 2006, James asked Meyers to meet to discuss a resolution of the agreements.  The letter provided as follows:

"Dear Dan:

"It has been a long time since you and I have spoken.  I have tried to call you a few times but I am not sure that I have the correct number.  I would really enjoy getting together to see what you are up to in your new situation.

"Also, as you can see from the attached letter, I am getting some pressure from the attorney for the Foundation to address our mutual interests in the 1.24 million shares of First Marblehead stock.  As you probably know, in December 2005 I was able to negotiate a resolution with Steve Anbinder relating to the other portion of the First Marblehead stock, and I would very much like to reach a comparable agreement with you.  I think it is in both of our interests to do that. . . .

---

[16] The letter from the Attorney General of New York indicated that the foundation did not appear to be a party to the letter agreements, and sought support for the foundation's claim that it was a party.

"Please give me a call so that we can get together for breakfast or lunch."

By letter dated August 21, 2006 (Carmichael letter), Meyers, through his personal attorney, Martin Carmichael, reiterated his position that he was acting within his rights under the agreements.  In closing, however, Carmichael stated:

"Meyers would like to make clear that he bears Mr. James no ill will whatsoever and is only seeking [to] have the benefit of their original agreement.  Moreover, while he will not negotiate in the face of any continued threats of litigation, Mr. Meyers would welcome any specific proposal by the Foundation that would make him reasonably whole in exchange for surrendering control of a portion of his stock and foregoing future dividends on it, taking into account [First Marblehead's] apparently healthy prospects for continued growth."

At the time of the Carmichael letter, First Marblehead was a highly successful corporation with growing revenue and income, and its stock was paying a dividend.  From the date of the Anbinder agreement to the date of the Carmichael letter, the share price of First Marblehead common stock had risen from approximately twenty dollars per share to about thirty-five dollars per share.  By early January of 2007, the stock hit a peak of more than fifty-six dollars per share.[17]

On November 16, 2006, the foundation filed a complaint alleging that Meyers had violated the terms of the agreements by

---

[17] On July 31, 2006, the stock closed at $29.62 and continued to climb until its peak in January, 2007.  By the time of trial, in April of 2011, shares of First Marblehead were trading in the range of $2.25 to $2.50 per share.  During the posttrial proceedings, the price dropped even further.

not unwinding them upon the plaintiffs' request and by not distributing to the plaintiffs dividends First Marblehead paid on the stock purchased through those agreements. The plaintiffs simultaneously sought a preliminary injunction seeking payment of all dividends into an escrow account. That request was denied by a motion judge (not the trial judge).

Rulings of law. As herein relevant, the trial judge rejected the plaintiffs' claims in count IV (breach of an implied term of the contract), determining that the terms of the agreements were silent with respect to the mutual understanding about the time to sell the stock, and that Meyers had not breached any duty to sell "on demand."[18] However, she concluded that Meyers and James had "essentially an old-fashioned, trusting, gentlemen's agreement" and that Meyers had "a duty of good faith and fair dealing implied in the Agreements with James to, upon reasonable request, engage in reasonable efforts to arrive at a reasonable time for sale and thus resolve the contracts," and that Meyers had failed to do so when he "unfairly rewarded his own interests at the expense of the

---

[18] In count IV of the amended complaint, the plaintiffs acknowledged that the agreements lacked an express termination date and "any provision regarding a procedure for determining when the shares of First Marblehead should be sold." Given the absence of any express provision in the agreements, the plaintiffs asked the judge to supply a reasonable term -- "namely, that upon demand by the Foundation, or in the alternative James, the stock must be sold and the profits distributed."

reasonable expectations of the [plaintiffs] (emphasis supplied)."

Discussion. The standard of review is well established. The judge's findings of fact are accepted unless they are clearly erroneous. Anastos v. Sable, 443 Mass. 146, 149 (2004). We review the judge's legal conclusions de novo. Ibid.

"Every contract implies good faith and fair dealing between the parties to it." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991), quoting from Warner Ins. Co. v. Commissioner of Ins., 406 Mass. 354, 362 n.9 (1990). The covenant of good faith and fair dealing requires that "neither party . . . do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. 471-472, quoting from Drucker v. Roland Wm. Jutras Assocs., 370 Mass. 383, 385 (1976).

However, the "scope of the covenant is only as broad as the contract that governs the particular relationship." Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385, cert. denied sub nom. Globe Newspaper Co. v. Ayash, 546 U.S. 927 (2005). "It cannot 'create rights and duties not otherwise provided for in the existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.'" T.W. Nickerson, Inc. v. Fleet Natl. Bank, 456

Mass. 562, 570 (2010), quoting from Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004).

A plaintiff has the burden of proving a lack of good faith on the part of the defendant. See Nile v. Nile, 432 Mass. 390, 398-399 (2000). A lack of good faith can be inferred from the totality of the circumstances, id. at 399, however, there is a presumption that all parties act in good faith, T.W. Nickerson, Inc. v. Fleet Natl. Bank, 456 Mass. at 574. A contract is to be construed "with reference to the situation of the parties when they made it and to the objects sought to be accomplished," Starr v. Fordham, 420 Mass. 178, 190 (1995) (citation omitted), and should also be accorded a construction that effectuates "[j]ustice, common sense and the probable intention of the parties," Haverhill v. George Brox, Inc., 47 Mass. App. Ct. 717, 720 (1999) (citation omitted), and gives the agreement "effect as a rational business instrument," Starr v. Fordham, supra at 192 (citation omitted).

Here, the trial judge, in essence, concluded that Meyers did not comply with the plaintiffs' request "to consider whether we can negotiate an equitable distribution of these shares" during the period from October 19, 2004, through July 31, 2006, in order to continue to hold the disputed stock and to unfairly collect dividends. According to the judge, Meyers's failure to comply deprived the plaintiffs of the benefit of the bargain and

demonstrated lack of good faith, given that Meyers no longer needed the agreements to prevent dilution of his stake after First Marblehead went public in October, 2003.  We are not persuaded that the evidence at trial supports the judge's finding of an improper motive by Meyers or that of an absence of good faith on his part.

First and foremost, the record before us does not support the judge's conclusion that Meyers was required to reach an agreement with the plaintiffs within twenty-one months of their initial request.  Even in James's July, 2006, letter, there is no suggestion that Meyers's failure to reach agreement by that time constituted a lack of good faith or that Meyers was under any deadline to respond to the letter.  Indeed, James expressed his willingness to enter into a new deal on comparable terms to the Anbinder agreement, which took more than one year to negotiate and to finalize.  In sum, there is no evidence in the record to support a conclusion that Meyers was required to reach an agreement to unwind the agreements no later than July 31, 2006.

There is also no basis in the record to support the contention that Meyers did not immediately comply with the request "to resolve the relationship" in order to extract financial concessions on something for which he had not bargained.  Meyers was content with the existing deal.  It was

the plaintiffs who sought to unwind the agreements and who indicated a willingness to make concessions in order to accomplish that goal.

Nor was there anything improper in Meyers continuing to hold the stock and to collect dividends after October, 2003. Meyers's intent in entering into the agreements was not limited to protecting his percentage interest in First Marblehead, but also included holding the stock and sharing in its appreciation with James, as evidenced by the formula in the agreements for distributing the sale proceeds. Hence, although stock payouts were not necessarily contemplated by either party at inception, Meyers's decision to hold the shares beyond the date of the IPO and to collect the dividends was his contractual right. Moreover, Meyers and James were knowledgeable parties to a commercial transaction who freely negotiated the terms of their agreements, and could act in their own self-interest so long as they honored their contractual obligations. Compare Clark v. Rowe, 428 Mass. 339, 342 (1998).

Meyers's refusal to unwind the agreements by July 31, 2006 did not deprive the plaintiffs of the benefit of the bargain. Here, James entered into the agreements in order to grow his foundation. By July 31, 2006, the growth of First Marblehead stock had exceeded all reasonable expectations of the parties. While the use of a discretionary contract right as a pretext may

justify a finding of a breach of the implied covenant, see Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. at 473, here, at the time Meyers refused to sell, First Marblehead was setting record income levels, the value of the stock was rising, and the prospects for continued growth and profitability were very strong. Although Meyers had sold some of his stock between 2003 and 2006, he retained the majority of his personal shares. As the trial judge found, Meyers continued to maintain a very substantial position in the stock of First Marblehead. In addition, James himself continued to hold shares of First Marblehead stock for investment purposes well into this litigation.

Additionally, we are persuaded that the judge erred when she reached her conclusion that the implied covenant of good faith was violated after conducting a unilateral inquiry into James's actions and expectations while discounting the reasonableness of Meyers's own expectations that he could continue to hold the stock. Instead, the trial judge emphasized the long-term implications of Meyers's understanding of the agreements as granting him sole discretion to decide when to sell. However, establishing a breach of the implied covenant of good faith required that the plaintiffs meet their burden of proving Meyers's lack of good faith. See Nile v. Nile, 432 Mass. at 398-399. Simply put, a demonstration of James's own

good faith in asking for the agreements' resolution does not make Meyers's refusal to unwind an act lacking in good faith. Equally, the possibility of Meyers breaching the implied covenant in the future does not prove retroactively Meyers's lack of good faith on July 31, 2006. Thus, neither argument can carry the plaintiffs' burden.

Finally, the damages must be vacated because the date of the breach was arbitrarily determined. The trial judge concluded that Meyers demonstrated a lack of good faith "and thus [that there was] a breach . . . of the covenant of good faith and fair dealing . . . as of the time of Meyers's receipt of James's letter in July, 2006." As a result, the judge chose July 31, 2006, as the "fairest" date for calculating damages. On this record, there are no findings to support the conclusion that damages for a breach of the implied covenant of good faith and fair dealing could be fairly awarded using the July 31, 2006, stock price.[19]

---

[19] The value of the stock fluctuated significantly from James's initial inquiry regarding a potential unwinding deal in October of 2004, through the date the plaintiffs filed their complaint. The value of First Marblehead stock was approximately thirty dollars per share on July 31, 2006; however, several months earlier it had traded as low as fourteen dollars per share. When the Anbinder agreement was struck in December of 2005, the stock had been trading at around twenty dollars per share; less than three years later, as a result of the financial crisis, the stock was trading at less than three dollars per share.

Nevertheless, we agree with the trial judge's declaration that the agreements contemplate that a sale of the shares will be effectuated, and thus, Meyers cannot refuse to sell the stock or otherwise to resolve his relationship with the plaintiffs indefinitely without violating the implied covenant of good faith and fair dealing.

Conclusion.  So much of the amended judgment as found for the plaintiffs on their claim for violation of the implied covenant of good faith and fair dealing is reversed.  In addition, so much of the amended judgment as declared that Meyers must reimburse the foundation for the fair market value of the subject stock on July 31, 2006, with interest through April 15, 2011, for a total damages award of $44,052,678, is reversed.  The matter is remanded so that the amended judgment may be augmented with a declaration clarifying the parties' obligations as they arise from the implied covenant of good faith and fair dealing.  In all other respects, the amended judgment is affirmed.

So ordered.