NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11608


BAY COLONY RAILROAD CORPORATION  vs.  TOWN OF YARMOUTH &
another.[1]



Norfolk.     October 7, 2014. - January 29, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.



Railroad.  Solid Waste Management.  Municipal Corporations,
    Contracts.  Contract, Municipality, Performance and breach,
    Implied covenant of good faith and fair dealing.  Federal
    Preemption.  Statute, Federal preemption.




    Civil action commenced in the Superior Court Department on
January 14, 2008.

    Motions for summary judgment were heard by John P. Connor,
Jr., J.; the remaining issues were tried before him; and a
motion for judgment notwithstanding the verdict was considered
by him.

    The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


    Joseph L. Tehan, Jr. (Jackie Cowin with him) for the
defendant.

_____

    [1] SEMASS Partnership.  The claims brought by Bay Colony
Railroad Corporation (Bay Colony) against SEMASS Partnership
were dismissed, and are not at issue in this appeal.

Joel G. Beckman (Dana A. Zakarian with him) for the plaintiff.

GANTS, C.J.  On June 30, 1989, the town of Yarmouth (town) entered into a transportation contract (contract) with the Bay Colony Railroad Corporation (Bay Colony) whereby Bay Colony was to transport solid waste from the town's waste transfer station to a waste-to-energy facility in Rochester (facility) operated by the SEMASS Partnership (SEMASS).  At that time, Bay Colony operated several rail lines in southeastern Massachusetts, including rail lines between the town and Rochester, pursuant to a lease agreement with the Commonwealth.  However, in the fall of 2007, the Commonwealth notified Bay Colony that, effective December 31, 2007, it would terminate Bay Colony's lease of the Cape Cod rail lines, which meant that Bay Colony would no longer be able to transport the town's waste to the facility by rail. Section 9 of the contract provided that, in the event the Commonwealth terminated Bay Colony's lease of the rail line, the town agreed to permit Bay Colony either to assign the contract to the railroad company that was awarded the lease of the rail line or to continue to transport the waste "pursuant to the terms of the [contract] either under an arrangement with a successor operator or by other modes of transportation."  Bay Colony notified the town by letter that, in accordance with the provisions of section 9, it intended to continue to transport

waste under the contract "by other modes of transportation," specifically, by truck rather than rail. The town, however, replied by letter that it intended to assign the contract to the railroad operating company that was awarded the relevant rail lease.[2] In or about April 2008, the town began transporting its waste from the transfer station to the facility with that railroad company.

Bay Colony filed suit, contending, among other claims, that the town had committed a breach of the contract by terminating Bay Colony as the waste transporter. A Superior Court judge granted Bay Colony's motion for summary judgment on its declaratory judgment claim, and declared that the contract granted Bay Colony "the right to assign its interest or fulfill the agreement by alternate means of transportation."[3] After trial, a Superior Court jury found that the town had committed a breach of the contract, and awarded damages of $800,000.

On appeal, the town claims, first, that G. L. c. 160, § 70A, prohibited Bay Colony from transporting the town's waste by truck after it lost its rail lease, and the judge erred as a

---

[2] The town of Yarmouth (town) actually did not assign the contract but instead entered into a new contract to transport waste to the facility with the railroad company that was awarded the rail lease that Bay Colony had lost.

[3] The judge denied the town's and Bay Colony's motions for summary judgment on the breach of contract claim, concluding that genuine issues of material fact remained to be resolved at trial.

matter of law in concluding that § 70A was preempted by the Federal Aviation Administration Authorization Act (act); second, that the permit issued to the town by the Department of Environmental Protection (DEP) for the operation of the town's waste transfer station prohibited the long-term trucking of waste, and the town had no obligation under the contract to seek a modification of the permit to allow its waste to be transported by truck; and third, that the town's contract with Bay Colony had terminated prior to the alleged breach.[4]  We transferred the appeal on our own motion.  We reject each of the town's three claims and affirm the judgment.

Discussion.  1.  Federal preemption of G. L. c. 160, § 70A. Enacted in 1925, G. L. c. 160, § 70A, allows "railroad corporation[s] . . . [to] own, maintain and operate motor vehicles not running upon rails or tracks . . . for the transportation of . . . freight."  G. L. c. 160, § 70A, inserted by St. 1925, c. 125, § 1, as amended through St. 1932, c. 236. But the statute forbids a railroad corporation from operating trucks for the transportation of freight within the Commonwealth in areas that the railroad corporation does not "serve[]" by rail.  Id. ("Motor vehicles operated by a railroad corporation directly or through subsidiaries for the transportation of

_____

    [4] The town does not challenge on appeal the declaratory judgment.

freight within the commonwealth shall be operated only in areas now served by such corporation"). The town contends that Bay Colony could not lawfully perform the contract by truck once it lost its rail line lease because it would then be operating motor vehicles for the transportation of freight in areas where it no longer provides rail service, in violation of § 70A.

In 1994, however, Congress passed the act "upon finding that [S]tate governance of intrastate transportation of property had become 'unreasonably burden[some]' to 'free trade, interstate commerce, and American consumers.'" Dan's City Used Cars, Inc. v. Pelkey, 133 S. Ct. 1769, 1775 (2013), quoting Columbus v. Ours Garage & Wrecker Serv., Inc., 536 U.S. 424, 440 (2002). See Pub. L. No. 103-305, Title VI, § 601(a), 108 Stat. 1605 (1994). The act completed the Federal deregulation of the trucking industry that had started with the enactment of the Federal Motor Carrier Act of 1980 "by expressly preempting [S]tate trucking regulation." Dan's City Used Cars, Inc., supra. The express preemption provision of the act provides, "[A] State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." Pub. L. No. 103-305, Title VI, § 601(c)(1), 108 Stat. 1606, codified as 49

U.S.C. § 14501(c)(1) (2012).[5]  The judge concluded that this provision preempts the State limitation on railroad-operated motor vehicles in § 70A.

"The critical question in any preemption analysis is always whether Congress intended that [F]ederal [law] supersede [S]tate law."  ACE Property & Cas. Ins. Co. v. Commissioner of Revenue, 437 Mass. 241, 246 (2002), quoting Archambault v. Archambault, 407 Mass. 559, 565 (1990).  See Altria Group, Inc. v. Good, 555 U.S. 70, 76 (2008), quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) ("'[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case").  Here, Congress expressly stated that State law is preempted, but that "does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of [S]tate law still remains."  Altria Group, Inc., supra.  See Medtronic, Inc., supra at 484, quoting Cipollone v. Liggett Group, Inc., 505 U.S. 504, 517 (1992) ("we must nonetheless 'identify the domain expressly pre-empted'").

The preemptive scope of the act's preemption clause is "purposefully expansive."  Massachusetts Delivery Ass'n v. Coakley, 769 F.3d 11, 18 (1st Cir. 2014).  The act preempts

---

[5] The preemption provision includes a variety of exceptions not relevant here.  See 49 U.S.C. § 14501(c)(2), (3) (exceptions for State regulation relating to public safety; intrastate transportation of household goods; certain towing companies; and "standard transportation practices").

State laws "'having a connection with, or reference to,' carrier 'rates, routes, or services,'" even if the "law's effect on rates, routes, or services 'is only indirect,'" and irrespective of "whether [the] law is 'consistent' or 'inconsistent' with [F]ederal regulation" (emphasis in original). Rowe v. New Hampshire Motor Transp. Ass'n, 552 U.S. 364, 370 (2008), quoting Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384, 386-387 (1992). See Massachusetts Delivery Ass'n, supra at 17-18. Congress' purpose was to avoid "a State's direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide." Rowe, supra at 372, quoting Morales, supra at 378.

The provision of § 70A at issue here -- which provides that railroad-operated motor vehicles "shall be operated only in areas now served by" the railroad -- is directly "related to a . . . route . . . of any motor carrier," 49 U.S.C. § 14501(c)(1), in that it prohibits some motor carriers from servicing routes where they do not provide rail service. The provision also is "related to a . . . service of any motor carrier," id., in that the route prohibition restricts the trucking services that railroads can offer in the Commonwealth. Because these restrictions limit a railroad's ability to compete freely with other motor carriers, preemption of their

enforcement would be consistent with Congress' purpose to let "competitive market forces" determine what services motor carriers provide. Rowe, 552 U.S. at 372, quoting Morales, 504 U.S. at 378.

The act, however, only preempts a State from enacting or enforcing laws "related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1) (emphasis added). "Congress did not define the word 'property.' Nor is the meaning of 'property' perfectly clear from the context of the statute." AGG Enters. v. Washington County, 281 F.3d 1324, 1329 (9th Cir.), cert. denied, 537 U.S. 822 (2002). The town offers two reasons why the solid waste transported to the facility is not "property" within the scope of § 14501(c)(1), and therefore why § 70A is not preempted with respect to the transportation of waste.

First, the town contends that it is plain from the legislative history of the act that Congress did not intend to preempt State regulation of the transportation of waste. The town specifically relies on the following passage from the report of the conference committee that drafted the bill that became the act:

> "The conferees further clarify that the motor carrier preemption provision does not preempt State regulation of garbage and refuse collectors. The managers have been

> informed by the Department of Transportation that under [Interstate Commerce Commission (ICC)] case law, garbage and refuse are not considered 'property'. Thus, garbage collectors are not considered 'motor carriers of property' and are thus unaffected by this provision."

H.R. Conf. Rep. No. 103-677, 103d Cong., 2d Sess. 85 (1994). Second, the town argues that the word "property" in § 14501(c)(1) should be read narrowly to avoid preempting the "historically [S]tate-regulated field of waste disposal."

We acknowledge that the regulation of local waste collection is a traditional exercise of the States' police powers. See Wheeler v. Boston, 233 Mass. 275, 281 (1919) ("it is within the well recognized limits of the police power" for city to regulate who may collect garbage and refuse from public streets). And we presume that Congress did not intend to preempt the regulation of local waste collection. See ACE Property & Cas. Ins. Co., 437 Mass. at 247, quoting Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress"); AGG Enters., 281 F.3d at 1330 ("Congress'[s] intent not to preempt the area of solid waste collection [by means of the act] is unambiguous" [emphasis in original]).

But the railroad-operated motor vehicle restriction in § 70A does not regulate local waste collection; it regulates the

operation of motor vehicles by railroad companies "for the transportation of freight," which is within the scope of the State regulation that Congress did intend to preempt through the act. The prohibition in § 70A against a railroad corporation operating trucks in areas not served by rail by that corporation applies regardless of what is transported by those trucks; it is not limited to trucks transporting waste. Because § 70A would prevent Bay Colony from transporting the town's waste solely because it is a railroad without a rail line in the relevant area (rather than because the freight being transported is waste), § 70A does not implicate the public health interest warranting local regulation of waste collection. In short, the act preempts enforcement of the railroad-owned motor vehicle restriction in § 70A against Bay Colony, because the restriction is an economic regulation relating to railroads and motor carrier services rather than a public health regulation relating to the transport of waste.

Moreover, even if we were to accept the town's premise that § 70A could be preempted by the act only where "property" is transported, it would still not spare § 70A from preemption in the circumstances of this case. Relying on ICC case law, the conference committee interpreted § 14501(c)(1) of the act to exclude "State regulation of garbage and refuse collectors" from

the scope of preemption.  H.R. Conf. Rep. No. 103-677 at 85.[6]

Bay Colony, however, did not contract with the town for the

collection of garbage; rather, its contract was for the

transportation of garbage from the transfer station to the

facility after it had been collected.  Garbage left out for

collection may not be "property," because it has been abandoned

by its previous owner.  But once the garbage has been collected,

it becomes the property of the company that collected it,

especially where that garbage may have economic value, whether

for the recyclables contained within or, as here, because of the

potential energy that may be extracted from that garbage at a

waste-to-energy facility.[7]  As explained by one member of the

---

[6] Prior to being abolished in 1995, the Interstate Commerce Commission (ICC) had authority to regulate common carriers under the Interstate Commerce Act.  The Congress that enacted the Federal Aviation Administration Authorization Act of 1994 (act) recognized that the term "transportation of property" "had its exact legal meaning refined over the years through" ICC case law, and was "using the term 'transportation of property' [in the act] consistent with its meaning in the Interstate Commerce Act and the related precedents."  140 Cong. Rec. 29,402 (1994) (statement of Rep. Norman Y. Mineta).

[7] See Graham v. Town & Country Disposal of W. Mo., 865 F. Supp. 2d 952, 956-959 (W.D. Mo. 2011) (upholding U.S. Department of Transportation's assumption of jurisdiction over trash collection business engaged in interstate transportation based on "broad meaning" ascribed to "property" under ICC case law and reasonableness of interpreting "property" to include waste); Interstate Commerce Comm'n v. Browning-Ferris Indus., 529 F. Supp. 287, 289-293 (N.D. Ala. 1981) (noting that the ICC "has continually vacillated" over whether radioactive waste is "property" despite its lack of economic value, but declining to

Congress that enacted the act, the meaning of "property" under ICC case law is "not so broad as to cover garbage collection" at curbside, but it is "broad enough to cover . . . recyclables being transported as part of a commercial transaction." 140 Cong. Rec. 29,402 (1994) (statement of Rep. Norman Y. Mineta). In other words, as the saying goes, "One man's trash is another man's treasure."[8]

We therefore conclude that Congress intended to include within the preemptive scope of the act the State regulation of a railroad corporation's transportation by truck of a town's waste from the transfer station to a waste-to-energy facility. Accordingly, we conclude that the enforcement against Bay Colony of the provision of § 70A limiting the operation of railroad-operated motor vehicles to areas served by the railroad is preempted by the act. Consequently, the town's affirmative defense that it was barred by § 70A from allowing Bay Colony to transport its waste to the facility by truck after it lost its rail lease fails as a matter of law.

---

uphold ICC jurisdiction over transportation of nonradioactive hazardous waste with no potential for reuse or recycling).

[8] Under the terms of the town's waste acquisition agreement with SEMASS, the town pays a fee to SEMASS for the waste that SEMASS accepts, but SEMASS pays a rebate to the town if the average price per kilowatt hour that SEMASS receives for the electrical energy generated from the town's waste at the facility exceeds a certain amount. The agreement contemplates that the rebate paid to the town by SEMASS could be greater than the fees paid by the town to SEMASS.

2.  Compliance with the town's DEP permit.  As required by
State regulation, the town held a permit to operate its waste
transfer station that had been issued to the town by the DEP in
1991.[9]  The permit stated that "[t]he operation of the facility
shall be in strict accordance with the approved plan," which we
take to mean the "Manual of Operating Procedures" (manual) that
the town had submitted as part of the town's permit application.
The permit also stated that "[n]o deviation or modification
thereto shall occur without [DEP] approval."  The manual
specified that tractor-trailers would be used to transport waste
to the facility when Bay Colony "cannot move trains on a short-
term emergency basis."  It also specified that "[i]n the event
that Bay Colony cannot move trains on a long-term (greater than
48-hour) basis, all incoming trucks will be directed to deliver
their refuse directly to the SEMASS facility."

In its motion for summary judgment, and again in its
motions for directed verdict and for judgment notwithstanding
the verdict, the town claimed that its refusal to allow Bay
Colony to transport the waste by truck after it lost its rail
lease did not constitute a breach of contract because the long-

---

[9] The permit issued to the town by the DEP in 1990 was
titled "Final Permit/Authorization to Construct."  In 1994, the
DEP sent a letter to the town regarding the waste transfer
station which "authorize[d] the operation" of the transfer
station, and further stated that "[s]aid operation shall be in
strict accordance with the terms of the permit."

term trucking of waste was not in compliance with its DEP operating permit and therefore would be in violation of law. The judge agreed that the DEP permit did not permit Bay Colony to truck the town's waste to the facility on a long-term basis, but he determined that a factual dispute existed for the jury to decide as to whether the permit reasonably could be amended through an application to DEP for a permit modification.

At trial, the judge correctly instructed the jury that "there is an implied covenant of good faith and fair dealing in every contract," and that the implied covenant "means that neither party may do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of that contract." See T.W. Nickerson, Inc. v. Fleet Nat. Bank, 456 Mass. 562, 569-70 (2010), quoting Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-472 (1991). The judge also instructed that, if the town committed a breach of the implied covenant, the town committed a breach of the contract. The judge instructed that the jury must determine whether the town had an obligation under the implied covenant of good faith and fair dealing to apply for a modification of the DEP permit that would allow the long-term trucking of waste and, if so, whether the failure to apply for that permit was a violation of the implied covenant. He also instructed the jury that, for the town to establish a defense that it would have

been illegal to allow Bay Colony to truck the waste based on the limitations in the DEP permit, the town had the burden of proving "that the modification of [the DEP] permit was beyond the reasonable control of" the town. The town did not request that the jury answer a special verdict question regarding this issue. However, from the jury's special verdict finding that the town committed a breach of its contract with Bay Colony, we can infer that the jury found that, under the implied covenant of good faith and fair dealing, the town was obliged after Bay Colony lost its rail lease to make reasonable efforts to apply for a modification of its DEP permit to allow for the long-term trucking of waste and that it was not beyond the reasonable control of the town to obtain such a modification.

On appeal, the town argues that it was not obligated to apply for a permit modification after Bay Colony lost its rail line lease because the contract did not expressly contain such an obligation, and because the implied covenant of good faith and fair dealing cannot be invoked to "create rights and duties not otherwise provided for in the existing contractual relationship." On the facts of this case, we disagree. Section 9 of the contract gave Bay Colony the right to elect to transport waste by truck if its rail lease were terminated. Where the town's manual contained a provision prohibiting long-term trucking of the town's waste to the facility, where the

town (not the DEP) had originally written this provision, and where the town could have applied to DEP for a permit modification, it was permissible for the jury to find that the town owed a duty under the implied covenant of good faith and fair dealing to make a good faith effort to obtain a modification of its DEP permit to allow Bay Colony to transport the town's waste by truck after the town learned that Bay Colony had elected this option under the contract. Where the town made no effort to obtain such a modification and made no mention of the DEP permit prohibition until Bay Colony had filed suit for breach of contract, a reasonable jury could have found that the town had committed a breach of the implied covenant of good faith and fair dealing and was using the DEP permit as a post-hoc "pretext" for abandoning the contract.

There was also abundant evidence at trial to support the finding that the breach caused harm to Bay Colony because DEP would have allowed the town's permit to be modified to permit the trucking of waste if the town had sought such a modification. The section chief for the DEP's division of solid waste management testified that obtaining a permit modification can be a "straightforward" process. He also testified that most waste transfer stations in southeastern Massachusetts transport their waste by truck, and that DEP does not in general have a

problem with a transfer station transporting solid waste by truck rather than by rail.[10]

Therefore, we conclude that there was sufficient evidence at trial to support the finding that the town's DEP permit did not render Bay Colony legally unable to perform the contract after it lost its rail lease, and that the jury reasonably rejected this affirmative defense to the town's breach of contract claim.

3. Duration of the contract.  In 1985, the town entered into a waste acquisition agreement with SEMASS in which the town agreed to deliver to the facility (and SEMASS agreed to accept) certain quantities of solid waste each year.  Even though G. L. c. 40, § 4 prohibited municipalities from entering into a contract for "disposal of garbage, refuse and offal by

---

[10] There was also evidence that the town believed it could obtain a modification of its DEP permit to allow for the trucking of waste.  In 1995, the town represented to Bay Colony that its solid waste could be trucked to the facility on a long-term basis, when the town told Bay Colony that it wanted to negotiate lower rates under the contract because "[r]ecent truck handling proposals indicate trash could be hauled to SEMASS less expensively over the road via trash trucks."  The town made similar representations publically in 2012 when it published a "request for proposals" seeking a private operator of its transfer station (to start in 2015), stating that "the successful offeror will be allowed to accept delivery of [solid waste] . . . for transfer to either rail or truck," and "may seek a . . . permit modification to allow a truck to truck transfer" of solid waste.

incineration" for a period exceeding twenty years,[11] the waste acquisition agreement specified that it ran for twenty-three years -- until January 1, 2008 -- and granted the town an option to extend the agreement through January 1, 2015. The twenty-year limitation in § 4 was repealed in 1990, see St. 1989, c. 687, § 7, and on October 26, 2004, the town exercised its option to extend the agreement to 2015.

Section 7 of the contract between the town and Bay Colony states that the term of the contract would "continue until the expiration of [the t]own's [waste acquisition agreement] with SEMASS." The town argues that the contract terminated as a matter of law on December 31, 2004, because when the waste acquisition agreement became effective on January 1, 1985, § 4 prohibited municipalities from making contracts for the "disposal of waste" for a period greater than twenty years.

The flaw in the town's argument is that, even accepting the town's claim that the original term of the waste acquisition agreement only ran for twenty years, it would have remained enforceable until December 31, 2004, and the town exercised its

---

[11] In 1985, G. L. c. 40, § 4 stated that "[a] town may make contracts for the exercise of its corporate powers including . . . [f]or the disposal of its garbage, refuse and offal for a period not exceeding five years; provided, however, that a contract for the disposal of garbage, refuse, and offal by incineration, by composting, in a sanitary land fill, or in any other sanitary manner approved by the department of environmental quality engineering, may be for a period not exceeding twenty years."

option to extend the original term of the waste acquisition agreement to 2015 on October 26, 2004, before it would have expired. When the option was exercised, § 4 was no longer effective, so no statute barred the continued enforceability of the waste acquisition agreement to 2015. There was sufficient evidence to permit the jury reasonably to conclude that the parties to the contract intended section 7 to mean that the duration of the contract would be the same as the duration of the waste acquisition agreement, including any extension of the latter's duration permitted by that agreement. Most telling, the original draft of the contract provided for a twenty-year term, but the town asked to revise that term because, as the town stated in its letter to Bay Colony, the town wanted the contract to "run for the same length (with time extension abilities) as" the waste acquisition agreement. Therefore, there was sufficient evidence to permit the jury to conclude that the contract remained in effect at the time of the town's breach in 2008.

Conclusion. The judge did not err in concluding as a matter of law that enforcement of G. L. c. 160, § 70A, against Bay Colony would have been preempted by the act, and that Bay Colony therefore would not have been acting in violation of an enforceable State law if it transported the town's waste by truck after it lost its rail lease. There was sufficient

evidence for a reasonable jury to reject the town's affirmative defense that it could not allow Bay Colony to truck its waste under its DEP permit, because the implied covenant and good faith obligated the town to make a good faith effort to apply for a modification of its permit and such a modification likely would have been allowed if sought. There was also sufficient evidence to support the jury's implicit finding that the contract remained in effect at the time of the town's breach. For these reasons, the judgment against the town is affirmed.

So ordered.