NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11898

ROBERT AND ARDIS JAMES FOUNDATION & another[1]  vs.
DANIEL MAXWELL MEYERS.


Suffolk.     December 10, 2015. - April 21, 2016.

 Present:  Gants, C.J., Spina, Cordy, Duffly, Lenk, & Hines, JJ.


Contract, Implied covenant of good faith and fair dealing.
    Damages, Breach of contract, Sale of stock.  Corporation,
    Stock.



    Civil action commenced in the Superior Court Department on November 16, 2006.

    After transfer to the business litigation session, the case was heard by Christine M. Roach, J.

    After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.


    Joseph L. Bierwirth, Jr. (Ryan P. McManus & Thomas J. Carey, Jr., with him) for the plaintiffs.
    Kevin P. Martin (Katherine C. Sadeck with him) for the defendant.


    LENK, J.  This case considers whether there was a breach of

the implied covenant of good faith and fair dealing in a

_____

    [1] Robert James.

contract dispute between two sophisticated investors. In 1998 and 1999, Robert James, acting on behalf of the Robert and Ardis James Foundation charitable foundation (foundation), agreed to advance over $650,000 to Daniel Meyers, the defendant, to purchase shares of stock in what was then a young, privately held company that Meyers had cofounded, in exchange for a portion of the proceeds of an eventual sale of those shares. The agreement was memorialized in two single-page, non-integrated letters that set out formulas by which to calculate the distribution of proceeds, but did not discuss the timing of sale. In 2006, following nearly two years of unsuccessful efforts to get Meyers to discuss bringing the agreements to a close, the foundation filed a complaint against Meyers seeking specific performance and damages.

After a six-day bench trial in the business litigation session of the Superior Court in 2011, a judge found that Meyers had committed a breach of the implied covenant of good faith and fair dealing, and awarded damages based on a date of breach of July 31, 2006.[2] The Appeals Court reversed, see Robert & Ardis James Found. v. Meyers, 87 Mass. App. Ct. 85, 86 (2015), and we granted the foundation's application for further appellate

_____

[2] The judge ruled in Daniel Meyers's favor on the foundation's remaining claims: division and distribution of the stock; dissolution of a claimed partnership or joint venture; declaration of an agency relationship; imposition of an implied contract term; payment of dividends; and declaratory judgment.

review.  Meyers argues that he did not commit a breach of the
implied covenant, and that the damages award should be vacated.
We conclude that the trial judge's decision was not erroneous,
and affirm the decision.

1.  Background.  We recite the facts found by the trial
judge, supported by relevant trial testimony and documentary
evidence, reserving certain details for later discussion.[3]
Meyers graduated from Brandeis University in 1984 with an
undergraduate economics degree, and spent the next seven years
working in the financial services industry.  In 1991, Meyers and
Stephen Anbinder started a company that provided loan
origination and related services for higher education students.
The company was incorporated in 1995 as First Marblehead
Corporation (First Marblehead), a privately held Delaware
corporation with headquarters in Massachusetts.  From its
incorporation through 2005, Meyers served as First Marblehead's
chief executive officer (CEO) and as the chair of its board of
directors.  Upon request from First Marblehead's board of
directors, he returned to those positions in 2008.

---

[3] At trial, the judge heard testimony from six witnesses and
admitted ninety-three exhibits in aid of interpreting the
agreements at issue.  Neither party argues that the admission of
extrinsic evidence violated the parol evidence rule.  See Uno
Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376,
379 n.2 (2004).

Robert James, who was eighty-six years old at the time of trial, has been a professional investor for over forty years. He received a master's degree in business administration with honors from Harvard Business School and has had an extensive career in both public service and private industry, including time spent at the Central Intelligence Agency, in the United States Navy, and in the oil industry. Robert James is a trustee of the foundation, organized under the laws of New York as a charitable section 501(c) foundation. The purpose of the foundation is to "give [the James's accumulated] money away." At all relevant times, his wife, Ardis James, and children, Catherine James Paglia and Ralph James, were also trustees of the foundation.[4] Like their father, Catherine James Paglia and Ralph James graduated from Harvard Business School.

During the 1990s, Catherine James Paglia was a principal of a private equity firm that invested in First Marblehead, and invested in First Marblehead personally. Ralph James served variously as First Marblehead's executive vice president, president and chief operating officer, and vice chairman. As a result of his children's connections to First Marblehead, Robert James developed a business friendship with Meyers, and they began to meet socially. Robert James considered the First Marblehead business plan "quite a brilliant thing." In

---

[4] Ardis James passed away in July, 2011.

November, 1997, he bought ten thousand shares of Meyers's privately held stock in First Marblehead for $360,000.

a.  The 1998 and 1999 agreements.  In 1998, First Marblehead offered its shareholders the right to purchase additional shares on a pro rata basis commensurate with each shareholder's percentage of existing ownership of the company. Because Meyers and Anbinder both lacked sufficient capital to participate in the rights offering, they were concerned that the offering would dilute their percentage of ownership of First Marblehead.  Meyers turned to Robert James for help.  The deal they eventually struck led to this litigation.

In exchange for the right to share in the proceeds of the sales of such shares, Robert James agreed to provide Meyers and Anbinder with the capital to purchase, in their own names, their maximum allotment of shares under the rights offering.  The agreement was memorialized in a February 20, 1998, letter from Meyers to Robert James (1998 agreement), which was drafted for Meyers by First Marblehead's outside counsel.  The letter read:

> "Dear Bob:
>
> "This letter will confirm our agreement regarding the purchase of common stock of The First Marblehead Corporation in the current rights offering by Steve Anbinder and me.
>
> "We have agreed that Steve and I will exercise our rights to purchase 18,627 and 13,161 shares, respectively, of stock @ $20.00 per share and that you will advance the funds to each of us in return for the right to participate

in the proceeds of sales. The total of the advances will be $635,760. The advances will be without recourse and will be repaid solely out of proceeds when the stock is sold.

"Steve and I will take title to the stock in our own names. Each of us will deliver the newly-issued share certificate[s] to you, and you will retain the certificates in your possession until the stock is sold. You may also vote the stock as you see fit.

"Upon the sale of the stock, you will be entitled to the sale proceeds up to a sale price of $30 per share. The balance of the sale proceeds, if any, will be divided 50% to you and 50% to either Steve or me. Either Steve or I may assign all or part of our interest to a third party.

"If this letter accurately reflects the terms of our agreement, I ask that you sign the duplicate copy of the letter and return it to me."

Robert James signed the letter in March, 1998, and eventually wired the advances directly to First Marblehead using funds from the foundation.[5] Anbinder and Meyers also signed the letter.

In January 1999, First Marblehead engaged in another rights offering. The parties executed a second letter agreement on January 25, 1999 (1999 agreement). The language of the 1999 agreement was almost identical to the language of the 1998 agreement -- the only differences were the numbers of shares to be purchased, and the formula for calculating the division of the proceeds upon sale. Robert James directed the foundation to advance the agreed-upon funds to First Marblehead. Between the

---

[5] Although Robert James signed the letter in his own name, he testified that he intended to sign it on behalf of the foundation.

two agreements, Robert James advanced $1,114,965 of foundation funds to First Marblehead, $653,340 of which was used to purchase shares in Meyers's name.[6]

First Marblehead made its initial public offering on October 31, 2003, and the value of the stock increased dramatically over the next few years.[7] Starting in 2005, after Meyers stepped down from his positions as CEO and chair of the board of directors, First Marblehead began issuing quarterly dividends to shareholders. Meyers ultimately received almost $2.5 million in dividends for the shares that were purchased pursuant to the 1998 and 1999 agreements. He did not distribute any of those dividends to Robert James or the foundation.

b. Efforts to conclude the agreements. The foundation first sought to bring the 1998 and 1999 agreements to a close in 2004. Catherine James Paglia testified that she telephoned Meyers multiple times that year for that purpose, and left him several voicemail messages that he did not return. In October,

---

[6] The remainder of the funds was used to purchase shares in Anbinder's name.

[7] As a result of a succession of stock splits, each of the shares subject to the 1998 and 1999 agreements was approximately sixty shares at the time of trial. Thus, the 31,107 shares owned by Meyers that were originally subject to the agreements were 1,866,420 shares in 2011. On October 31, 2003, the stock price was approximately $14 per share. By July 31, 2006, the price had increased to approximately $30 per share. By January 2007, several months into this litigation, the stock was trading at around $56 per share. Stock values declined significantly, however, after the stock market crashed in 2008.

2004, she also sent Meyers and Anbinder an electronic mail message that sought to "negotiate an equitable distribution" of the shares in order to bring the agreements to a close. While Anbinder eventually agreed to a distribution of that sort,[8] Meyers never responded to Catherine James Paglia's message. Meyers also did not respond to repeated efforts during 2005 and 2006 by both Catherine James Paglia and Robert James to reach him over the telephone in order to discuss concluding the agreements.

Meyers knew from conversations with Anbinder that the foundation wished to conclude the agreements. When Anbinder asked him "why [he] wanted this aggravation [of the James dispute] in his life," however, Meyers stated that he had no interest in discussing the possibility of selling the shares with Robert James or his daughter. Nonetheless, between 2003 and 2006, Meyers sold over three million shares of other First Marblehead stock that he owned, for more than $86 million. Meyers explained at trial that he made a conscious decision to sell his personally held shares of First Marblehead as opposed to agreeing to sell or divide the shares held with the

---

[8] The foundation and Anbinder ultimately agreed that Anbinder would receive half of the proceeds of the sale of the stock that had been purchased in his name using the foundation's funds.

foundation, because that way he could continue to collect dividends from the shares purchased with the foundation's funds.

After receiving advice from the foundation's counsel that the foundation needed to secure the proceeds of its investment, Robert James sent Meyers a letter on July 10, 2006, asking to meet in order to discuss the conclusion of the agreements.[9] Meyers finally replied on August 21, 2006, via a letter from his personal attorney. In the letter, Meyers stated that, "as the owner of the stock, [he] retain[e]d full discretion as to when it will be sold." He added that he "would welcome any specific proposal by the foundation that would make him reasonably whole in exchange for surrendering control of a portion of his stock

---

[9] He wrote,

"Dear Dan:

"It has been a long time since you and I have spoken. I have tried to call you a few times but I am not sure that I have the correct number. I would really enjoy getting together to see what you are up to in your new situation.

"Also, as you can see from the attached letter, I am getting some pressure from the attorney for the Foundation to address our mutual interests in the 1.24 million shares of First Marblehead stock. As you probably know, in December 2005 I was able to negotiate a resolution with Steve Anbinder relating to the other portion of the First Marblehead stock, and I would very much like to reach a comparable agreement with you. I think it is in both of our interests to do that.

". . .

"Please give me a call so that we can get together for breakfast or lunch."

and forgoing future dividends on it, taking into account [First Marblehead's] apparently healthy prospects for continued growth."  On November 16, 2006, the foundation filed the instant lawsuit.[10]

2.  Discussion.  "We accept the judge's findings of fact in a bench trial unless they are clearly erroneous, . . . and the credibility of the witnesses rests within the purview of the trial judge" (citation omitted).  See Weiler v. PortfolioScope, Inc., 469 Mass. 75, 81 (2014) (Weiler).  However, "[t]he judge's legal conclusions are reviewed de novo."  Anastos v. Sable, 443 Mass. 146, 149 (2004).  Based on the trial judge's findings of fact in this case, we discern no error in her determinations that Meyers committed a breach of the implied covenant of good faith and fair dealing and that July 31, 2006, was the date of breach.

a.  Nature of the agreements.  The 1998 and 1999 letter agreements were silent concerning the time at which the stock would be sold.  At trial, the parties had opposite views on how to interpret that silence.  The foundation asked the judge to supply a contract term imposing on Meyers an obligation to sell the shares if the foundation so demanded.  Robert James testified that it had been "essential" to him that he and Meyers

_____

[10] The complaint was later amended to add Robert James as a plaintiff.

agree on when to sell the stock.  He explained, "Otherwise I'm in this forever," adding,

> "Our agreement between Dan and me, it was [not] that specific, but the idea was that we were protecting each other.  You get into something like this, in one page it's so, who can forecast what's going to come up?  We take care of each other.  That was our agreement."

Meyers, on the other hand, maintained that the absence of a specific timing term in the written documents reflected a bargained-for decision by the parties.  He explained that an early draft of what became the 1998 agreement had included language that Robert James could retain the share certificates in his possession "until such time as we agree that the stock should be sold" (emphasis added).  Because the final version of the document removed the reference to mutual agreement and included financial terms that were more profitable for the foundation, he contended that he had bargained for and secured complete discretion over when, or if, the shares would be sold. In his view, there was no time limit on his holding of the shares, he had no obligation ever to make the shares productive of income or capital for the foundation, and, if he wished, he even could leave them to his heirs.

The judge concluded that the parties had not reached a mutual understanding about the time to sell the stock that was reflected in the written documents.  She declined either to supply a term requiring Meyers to sell "on demand," or to

construe the agreements as giving Meyers "sole and unbridled discretion" regarding the timing of sale. Nonetheless, she credited Robert James's testimony regarding the nature of the parties' "gentleman's" agreements, "whereby the two would share the future risks and rewards of purchasing additional First Marblehead stock." She also credited testimony that Meyers's intent in executing the 1998 and 1999 agreements was to "foil" efforts by other early shareholders in First Marblehead to dilute Meyers's and Anbinder's percentage ownership of the company, and that Robert James had agreed to assist Meyers on the understanding that he would participate in the proceeds of sale of the stock. The judge did not, however, credit Meyers's interpretation of the agreements, describing them as "neither rational nor fair." She explained,

> "Meyers's interpretation would now effectively deprive the Foundation forever of the benefit of its bargain through a profitable sale of the stock. Meanwhile, Meyers has experienced all of the benefit of the bargain of owning additional stock he could not have owned but for James."

We defer to the judge's assessment of the nature of the parties' contractual arrangement. "[A] contract should be construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties" (citation omitted). Starr v. Fordham, 420 Mass. 178, 192 (1995). The agreements here clearly contemplated sale at some point, because they set out formulas for the distribution of the

eventual proceeds "[u]pon the sale of the stock." Yet as long as Meyers continued to hold the shares, the foundation would receive no return on its initial investment, and had no recourse against Meyers or Anbinder personally if the stock decreased in value. On the other hand, any time of sale would have resulted in a profit for Meyers, because he risked none of his own money in the purchase of the shares. Given the trial testimony and documentary evidence, the judge did not err in concluding that the foundation had a reasonable expectation that it would share in the eventual profits from sale before the proverbial Twelfth of Never.[11] Compare Shayeb v. Holland, 321 Mass. 429, 430-431 (1947) (construing sale contract to require performance within reasonable time).

b. Implied covenant of good faith and fair dealing. Mindful of the fact that every contract in Massachusetts is subject to an implied covenant of good faith and fair dealing, see Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991) (Anthony's Pier Four), and that "[a] breach occurs when one party violates the reasonable expectations of the other," Chokel v. Genzyme Corp., 449 Mass. 272, 276 (2007) (Chokel), and cases cited, the judge ruled that Meyers had committed a breach of the covenant in this case by ignoring and declining to honor

---

[11] "And that's a long, long time." See The Twelfth of Never (J. Livingston & P.F. Webster), on Johnny Mathis Gold: A 50th Anniversary Celebration (Sony BMG Music Entertainment 2006).

Robert James's and Catherine James Paglia's "clear, rational, and good faith efforts" on behalf of the foundation to resolve the contractual relationship between the parties. Although the judge acknowledged that the foundation had never formally demanded that Meyers sell the shares, in her view, Meyers's position was "unfaithful" to what she found to have been "the intended and agreed upon expectations of the contract, including the trust [Robert] James reasonably placed in Meyers regarding sale of the stock." She concluded,

> "I find and rule it was part of Meyers'[s] duty of good faith and fair dealing implied in the Agreements with James to, upon reasonable request, engage in reasonable efforts to arrive at a reasonable time for sale and thus resolve the contracts, rather than continuing to assert his right to delay sale and collect dividends indefinitely."

Given the trial judge's findings regarding the nature of the agreements, we agree with this conclusion.

"The covenant of good faith and fair dealing is implied in every contract, . . . including contracts between sophisticated business people" (citations omitted). See Weiler, supra at 82. The covenant "exists so that the objectives of the contract may be realized." Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385, cert. denied sub nom. Globe Newspaper Co. v. Ayash, 546 U.S. 927 (2005). It provides "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."

Anthony's Pier Four, supra at 471-472, quoting Druker v. Roland Wm. Jutras Assocs., Inc., 370 Mass. 383, 385 (1976). "In determining whether a party violated the implied covenant of good faith and fair dealing, we look to the party's manner of performance. . . . There is no requirement that bad faith be shown; instead, the plaintiff has the burden of proving a lack of good faith. . . . The lack of good faith can be inferred from the totality of the circumstances." Weiler, supra, quoting T.W. Nickerson, Inc. v. Fleet Nat'l Bank, 456 Mass. 562, 570 (2010). However, "[t]he scope of the covenant is only as broad as the contract that governs the particular relationship." Ayash v. Dana-Farber Cancer Inst., supra.

The totality of the circumstances found by the trial judge shows that Meyers failed to effectuate in good faith the sales of stock that the agreements clearly contemplated. Although Meyers knew from his conversations with Anbinder that the foundation wished to bring the agreements to a close, he refused to speak with Robert James and Catherine James Paglia for nearly two years regarding effectuating the sale of the shares. During the same time period, Meyers collected millions of dollars in dividends on those shares that he kept for himself, but sold millions of other shares of First Marblehead stock that he owned for many times what he had initially paid for them. Taking an unwarranted view of his contractual rights, he thus sought to

achieve for himself a better deal than the sharing of risks and rewards for which the judge found he had originally bargained. See Anthony's Pier Four, supra at 472 (attempt to thwart conclusion of agreement as pretext to obtain more favorable terms constitutes breach of implied covenant).

Unlike in Eigerman v. Putnam Invs., Inc., 450 Mass. 281, 288 (2007), and Chokel, supra at 277, where we determined that decisions to buy and exchange shares only at particular times did not result in a breach of the implied covenant because the agreements at issue in those cases provided the defendants with sole discretion regarding the timing of sale, the trial judge here explicitly found that Meyers did not have such discretion. His actions therefore violated the foundation's reasonable expectations that he would "engage in reasonable efforts to arrive at a reasonable time for sale."  Otherwise put, by turning a deaf ear to the foundation's repeated requests, thwarting the effectuation of the agreements, he destroyed or injured the foundation's right to receive the fruits of those agreements.

Our decision here is more analogous to our recent decision in Bay Colony R.R. Corp. v. Yarmouth, 470 Mass. 515, 524 (2015), where we concluded that a defendant's inaction constituted a breach of the implied covenant.  There, the town of Yarmouth terminated a waste transportation contract that it had made with

the plaintiff railroad company after the railroad company lost its lease to a local rail line. See id. at 516. The railroad company sought to continue to transport the waste by truck rather than rail, as permitted by its contract, but the town did not allow it to do so, purportedly on the basis that a waste transportation permit that the Department of Environmental Protection (DEP) had issued to the town did not allow for the long-term trucking of waste. Id. at 516-517. Although the town believed that the DEP would modify its permit upon request, id. at 524 n.10, it made no effort to seek such a modification. Id. at 524.

We held that the jury reasonably could have concluded that the town's unwillingness to accommodate the railroad company's efforts to perform on the contract resulted in a breach of the implied covenant of good faith and fair dealing, because it violated the railroad company's reasonable expectations under the contract. Id. Likewise here, Meyers's unwillingness for an extended period of time even to speak with Robert James or Catherine James Paglia regarding the disposition of the stock was contrary to their reasonable expectations on behalf of the foundation. See 17A Am. Jur. 2d Contracts § 370, at 356 (2004) ("whenever the cooperation of the promisee is necessary for performance of the promise, there is a condition implied that the cooperation will be given").

Although the implied covenant "may not . . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship," Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004), no such rights or duties were created in this case. We disagree with Meyers's contention on appeal that the judge impermissibly imposed on the parties a duty to negotiate a new deal, a characterization that the judge squarely rejected in her ruling posttrial that "[t]he court did not find a duty to negotiate." To the contrary, while the parties remained free to strike a new deal with a different formula for allocating proceeds -- as happened with Anbinder -- they were under no obligation to do so. Their duty was instead to cooperate in effectuating the existing, agreed-upon deal on its own terms. The judge's determination that Meyers had committed a breach of the implied covenant was grounded in the fact that he had taken an extreme and unwarranted view of his rights under the contract, and accordingly had declined to engage with the foundation's efforts to effectuate the sale and division of proceeds as to which it had a reasonable expectation. As she made clear in her ruling on posttrial motions, the judge determined only that "Meyers breached his duty to resolve the Agreements in good faith pursuant to their terms."

Meyers's other arguments that he did not commit a breach of the implied covenant are similarly unavailing. While the judge recognized that the foundation never explicitly demanded that Meyers sell the shares, the absence of a demand is beside the point because no such demand was required. Based on her findings regarding the nature of the contractual relationship between the parties, to which we defer, the judge determined correctly that Meyers failed to effectuate the agreements in good faith when he did not respond in a timely manner to the foundation's repeated inquiries. See Weiler, supra at 82. Furthermore, the response that Meyers finally gave on August 21, 2006, via a letter from his personal attorney, does not alter our analysis. In her post-trial rulings, the judge explicitly rejected Meyers's contention that the August 21, 2006, letter established his good faith willingness to perform his obligations under the agreements. The judge explained, "I did not, I do not, and I cannot so find." Moreover, she "found sufficient direct and circumstantial evidence throughout the record -- including but by no means limited to the parties' respective demeanors in testifying -- to find a breach by Meyers."

c. Date of breach. The judge ultimately set the date of breach at July 31, 2006, stating that July, 2006, "was the 'end date' pursuant to what the record supports to have been nearly

two years of efforts by plaintiffs to achieve sale of the stock." She awarded the foundation damages equal to the value of its portion of the shares on that date pursuant to the formulas set out in the 1998 and 1999 agreements. Meyers argues that there was no evidentiary basis for this finding. The date of breach and the reasonable time for performance of a contract, however, are questions for the trier of fact. See Karen Constr. Co. v. Lizotte, 396 Mass. 143, 149 (1985); Powers, Inc. v. The Wayside, Inc., of Falmouth, 343 Mass. 686, 691 (1962). Furthermore, "an element of uncertainty in the assessment of damages is not a bar to their recovery . . . . [W]here, as here, the difficulties in determining damages arise in large part from [the defendant's conduct], . . . [a] reasonable approximation will suffice" (quotations and citations omitted). National Merchandising Corp. v. Leyden, 370 Mass. 425, 430 (1976).

Recognizing that there is often an element of uncertainty in the assessment of damages, we defer to the trial judge's finding. July 31, 2006, was three full weeks after Robert James's final letter on behalf of the foundation prior to the start of this litigation. Although Robert James's letter was relatively informal, in keeping with the parties' course of dealings, it followed nearly two years during which Meyers had opted not to respond in any form to the foundation's repeated requests to discuss concluding the agreements. That delay was

in sharp contrast to the foundation's experience in dealing with Anbinder, who responded to Catherine James Paglia's initial inquiries regarding the effectuation of sale.  While the resolution of the Anbinder agreement involved terms different from the formulas contained within the 1998 and 1999 written agreements, it was not clearly erroneous for the judge to apply those formulas in order to calculate damages.[12]

Judgment affirmed.

---

[12] Meyers additionally argues that "non-recourse" provisions in the 1998 and 1999 agreements prevent recovery beyond the current value of the stocks purchased using the foundation's money.  Because he did not raise this argument at trial, however, it has been waived.  See Central Transp. Inc. v. Package Printing Co., 429 Mass. 189, 195 (1999), quoting Royal Indem. Co. v. Blakely, 372 Mass. 86, 88 (1977).