# United States Court of Appeals
## For the First Circuit

No. 24-1719

SMS FINANCIAL RECOVERY SERVICES, LLC, as successor in interest
to Harmony Healthcare International Inc.,

Plaintiff, Appellant,

v.

SAMARITAN SENIOR VILLAGE, INC., d/b/a Samaritan Summit Village
and SAMARITAN MEDICAL CENTER, INC., d/b/a Samaritan Keep Nursing
Home,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Gelpí and Kayatta, Circuit Judges,
and Smith,* District Judge.

Carlo Cellai, with whom Cellai Law Offices, P.C. was on brief,
for appellant.
Mary L. D'Agostino, with whom Erica L. Masler, Hancock
Estabrook, LLP, Gareth W. Notis, and Morrison Mahoney LLP were on
brief, for appellees.

June 27, 2025

_____

* Of the District of Rhode Island, sitting by designation.

**SMITH**, **District Judge**.    Plaintiff-Appellant SMS Financial Recovery Services, LLC ("SMS") appeals the grant of summary judgment to Defendants-Appellees Samaritan Senior Village, Inc. and Samaritan Medical Center, Inc. (together, "Samaritan"). SMS sued Samaritan for the balance due on two contracts that Samaritan cancelled during the COVID-19 pandemic.   The district court found that Samaritan's performance of the contracts was excused as impracticable.   But because a genuine dispute of material fact remains, we reverse in part and remand to the district court.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

We set forth the facts "in the light most hospitable to the nonmovant, consistent with record support," as we do when reviewing a ruling on summary judgment. McKenney v. Mangino, 873 F.3d 75, 78 (1st Cir. 2017).

Samaritan Senior Village, Inc. ("Samaritan Summit") is an assisted living and skilled nursing facility located in Watertown, New York.   Samaritan Medical Center, Inc. ("Samaritan Keep") is a long-term care facility nearby.   SMS is successor-in-interest to Harmony Healthcare International, Inc. ("Harmony"), a healthcare consulting services provider.   There is diversity of citizenship between the parties.

In December 2019, Samaritan and Harmony contracted for Harmony to provide Samaritan with healthcare consulting services

for a three-year period. Harmony and Samaritan entered into two substantively identical contracts, one between Harmony and each Samaritan entity. The contracts said that Harmony would provide Samaritan with a suite of healthcare consulting services -- for example, "audit and associated chart reviews," assistance "making appropriate coverage determinations," and "training for the facility staff" -- along with two site visits to each Samaritan entity per month. The contracts did not specify whether the services described would necessarily be provided at the time of the site visits. In exchange, Samaritan agreed to pay Harmony $6,100 per month on each contract.

The contracts were negotiated and signed on behalf of Samaritan by Robert Baranello, Vice President of Post-Acute Care. In a deposition taken three years later, Baranello described his understanding of the contracts. He testified that the contracts were primarily for document review services and that Harmony could have provided most, if not all, of the contracted services remotely.

The parties commenced performance of the contracts in January 2020. A Harmony representative visited Samaritan Summit and Samaritan Keep for two days each in January, February, and March of 2020. The representative reviewed documents, met with staff, conducted exit meetings, and generated notes that were

turned into reports.  Samaritan paid Harmony its fee for each of these months.

In March 2020, the COVID-19 pandemic began to sweep across the nation.  On March 7, the governor of New York issued an Executive Order declaring a state of emergency.  On March 12, the governor issued another Executive Order extending the state of emergency.  That Order said, "Any guidance issued by the New York State Department of Health related to prevention and infection control of COVID-19 at nursing homes and adult care facilities, including but not limited to guidance on visitation, shall be effective immediately and shall supersede any prior conflicting guidance."

The next day, the New York State Department of Health issued a "Health Advisory" concerning "COVID-19 Cases in Nursing Homes and Adult Care Facilities."  It "required" nursing homes and adult care facilities to, "[e]ffective immediately, suspend all visitation except when medically necessary (i.e. visitor is essential to the care of the patient or is providing support in imminent end-of-life situations)."  The record does not clearly state how long the Health Advisory remained in effect.

On March 31, a Harmony representative emailed Samaritan to offer "remote audits" due to the pandemic.  The email read, "[w]hile we cannot access your software remote[ly, our representative] is willing to come to NY if you have a computer

she could use at a local hotel." Barbara Morrow, Samaritan's Chief Compliance Officer, responded that "we will need to postpone the visit on site or remotely as our complete focus is on COVID right now. I'm afraid even remotely we would not receive the value of the visit as our goal is to audit and educate our staff and it just wouldn't be feasible."

On May 4, Morrow emailed Harmony again, saying:

> Due to the extreme financial constraints that the COVID-19 pandemic has placed on our healthcare organization, we have been forced to make the decision to discontinue many contracts systems wide. Please allow this letter to serve as the formal notice of termination [of the Samaritan-Harmony contracts].

On May 6, a Harmony representative emailed Morrow asking if Samaritan "would like an on-site or remote audit," noting that "[e]ven with remote audits we can help with compliance, reimbursement, survey & regulatory, emergency preparedness, facility assessments, etc." In reply, Morrow reiterated that "[d]ue to the pandemic and the restrictions on visitors of any type as well as the extreme financial situations this epidemic has put on our healthcare system, [Samaritan] will need to cancel our contracts." Kris Mastrangelo, Harmony's President and CEO, responded to Morrow saying that Harmony was "open to a suspension of the contract."

On May 14, Samaritan's counsel sent a letter to Mastrangelo:

> Please consider this letter to be Notice of Termination of the Agreements, effective immediately, based upon [Harmony's] breach of the Agreements due to its failure to provide services in accordance with the terms of the Agreements beginning in April 2020. The restrictions placed on Nursing Homes by the State of New York during the Covid-19 pandemic make it impossible for Harmony to perform the on-site services required by the Agreement now and for the foreseeable future. Therefore, the fact is Harmony has been, and will continue to be, unable to perform its obligations under the Agreements. This letter supersedes and replaces Ms. Morrow's May 4, 2020 letter.

On October 20, 2020, Harmony sued Samaritan for breach of contract in Massachusetts state court. Samaritan removed the action to federal court, which had jurisdiction over the dispute under 28 U.S.C. § 1332(a)(1). On November 13, 2023, Harmony filed a Suggestion of Bankruptcy. SMS then filed an Amended Complaint as successor-in-interest to, and secured creditor of, Harmony. It alleged breach of contract, quantum meruit, breach of the covenant of good faith and fair dealing, and violations of Massachusetts state law.

Both parties moved for summary judgment. On July 18, 2024, the district court granted summary judgment to Samaritan and denied SMS's motion. See SMS Fin. Recovery Servs., LLC v. Samaritan Senior Vill., Inc., No. 1:20-cv-12135, 2024 WL 3458348, at *1 (D. Mass. July 18, 2024). The court found that Samaritan's

- 6 -

performance was excused under the doctrine of impracticability. New York had limited nursing home visitation to visitors who were medically necessary for patient care. This meant that Harmony personnel could not come to Samaritan's premises to provide the services it had contracted to provide. Thus, the district court reasoned, "Samaritan did not breach the contract by terminating it where the New York State Department of Health guidelines made it illegal for Samaritan to allow [Harmony] representatives inside its facilities." Id. at *7.

SMS timely appealed. It asks this Court to reverse the holding of the district court and order that summary judgment in its favor be entered.

## II.  LEGAL STANDARD

Summary judgment is appropriate when the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). We review the grant of summary judgment de novo. See Burt v. Bd. of Trs. of Univ. of R.I., 84 F.4th 42, 54 (1st Cir. 2023).

## III. ANALYSIS

SMS argues that, contrary to the district court's reasoning, Samaritan's obligations under the contracts were not excused by the doctrine of impracticability. We agree that summary judgment is precluded by an unsettled factual dispute as to whether

the doctrine applies in this case.  Specifically, a genuine dispute remains as to whether Harmony could have performed substantially all of its obligations under the contracts despite the state COVID-19 visitation restrictions.  If so, Samaritan's performance would not be excused.  This issue must be determined by a finder of fact.

## A. Impracticability and Frustration of Purpose

The doctrine of impracticability[1] discharges a party's duty to render performance "[w]here, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made."  Restatement (Second) of Conts. § 261 (Am. L. Inst. 1981) [hereinafter Restatement]; see Le Fort Enters., Inc. v. Lantern 18, LLC, 199 N.E.3d 1257, 1265-67 (Mass. 2023).  The doctrine's "companion rule" is frustration of purpose.  Le Fort, 199 N.E.3d at 1271.  Frustration of purpose provides the flip side of the same principle: "Where . . . a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his

---

[1] The doctrine of impracticability is "rooted in the narrow impossibility doctrine" at common law. Le Fort Enters., Inc. v. Lantern 18, LLC, 199 N.E.3d 1257, 1265 (Mass. 2023).  The term "impossibility" was used at common law, whereas "impracticability" is preferred by the Uniform Commercial Code. See Restatement (Second) of Conts. ch. 11, intro. note, reporter's note (Am. L. Inst. 1981).

remaining duties to render performance are discharged." Chase Precast Corp. v. John J. Paonessa Co., 566 N.E.2d 603, 606 (Mass. 1991) (quoting Restatement § 265). "Since the two doctrines differ only in the effect of the fortuitous supervening event," Massachusetts courts look to cases interpreting both doctrines when analyzing an impracticability or frustration of purpose issue. Id.

We note at the outset that Samaritan does not claim that the COVID-19 non-visitation directive rendered its own performance impracticable -- it says that the directive rendered Harmony's performance impracticable (because Harmony could not come to Samaritan's premises). However, such a theory can only be used to excuse Harmony's obligation to render performance. See Le Fort Enters., 199 N.E.3d at 1266 (describing that the doctrine of impracticability discharges the duty of the party whose performance was made impracticable). Samaritan seeks to excuse its own duty to perform -- not Harmony's. The doctrine of impracticability, then, does not quite fit Samaritan's theory of the case. Perhaps gesturing towards this issue, SMS suggests that Samaritan's impracticability defense may be characterized as one of frustration of purpose. Indeed, the frustration of purpose doctrine matches Samaritan's theory more neatly. Samaritan's basic position is that Harmony could not perform its essential obligations under the contract (which, by corollary, frustrated

- 9 -

Samaritan's "principal purpose" in contracting); that this occurred "without [Samaritan's] fault"; and that Harmony's ability to perform its on-site obligations was "a basic assumption on which the contract was made." See Chase Precast Corp., 566 N.E.2d at 606. And of course, Samaritan seeks to "discharge[]" its own "duties to render performance." Id. For this reason, we proceed using the term "frustration of purpose" rather than "impracticability." And because the doctrines are so closely related, we do not worry that reliance on frustration of purpose steers us afield of the parties' argued positions.[2] See id. (explaining that, in both frustration of purpose and impracticability cases, the "principal question" of "whether an unanticipated circumstance, the risk of which should not fairly be thrown on the promisor, has made performance vitally different from what was reasonably to be expected" is the same; the only difference is the "effect of the supervening event" (internal quotation marks omitted)).

Under Massachusetts law, "[t]he doctrine of frustration of purpose excuses performance under a contract in limited circumstances 'where unanticipated supervening events require it.'" Inland Com. Real Est. Servs., LLC v. ASA EWC, LLC, 213

---

[2] We have not, however, considered whether this case should more properly be viewed through framing that the parties have eschewed.

N.E.3d 604, 607 (Mass. App. Ct. 2023) (quoting Le Fort, 199 N.E.3d at 1264). "For the doctrine to apply, the purpose that is frustrated 'must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense.'" Id. (quoting Le Fort, 199 N.E.3d at 1271). "The doctrine is construed narrowly 'so as to preserve the certainty of contracts.'" Id. (quoting Le Fort, 199 N.E.3d at 1264).

In the context of COVID-19 business disputes, "the vast majority of courts to have considered frustration of purpose have declined to apply the doctrine to temporary business closures caused by government shutdown orders." Id. This is partly because courts hesitate to find frustration of purpose where an unanticipated impediment exists for only a short portion of a longer contract. "The frustration of purpose doctrine is intended to address the circumstance where an unanticipated event entirely or substantially destroys the overall purpose of the contract, 'thus destroying the value of performance'; ordinarily therefore, the legal effect of a successful frustration defense is that 'the parties are excused from further performance.'" Id. at 608-09 (quoting Chase Precast Corp., 566 N.E.2d at 605) (emphases added). A temporary shutdown order is unlikely to "entirely or substantially" destroy the purpose of a contract that was intended to last much longer than the duration of the impediment. The sweeping nature of the remedy, too, emphasizes that the doctrine

- 11 -

is not meant to apply where an impediment only briefly frustrates a party's purpose.

In addition, the applicability of the doctrines of impracticability and frustration of purpose is very often a jury question. See, e.g., Le Fort, 199 N.E.3d at 1263. Courts consider the entire record -- not just the text of the contract -- in determining whether the doctrines apply. See id. at 1272; see also Chase Precast Corp., 566 N.E.2d at 606-07 (noting that frustration of purpose "is a question for the trier of fact" and describing extrinsic evidence considered by the factfinder).

## 1.

SMS argues that frustration of purpose does not apply because Samaritan's purpose in contracting was not "substantially" frustrated by the non-visitation order: Harmony could have performed its obligations under the contracts without on-site visits. SMS points to the deposition testimony of Robert Baranello, who negotiated and signed the contracts on Samaritan's behalf. Baranello testified that the contracts were primarily for document review services which Harmony could have provided remotely. Viewed this way, the non-visitation order would not have frustrated Samaritan's purpose in contracting.

Samaritan responds that Baranello's testimony should not be considered because it "is immaterial to the Court's interpretation of the contractual language." Contract

interpretation, however, is a different endeavor than determining whether doctrines of excuse (like impracticability or frustration of purpose) apply. Courts consider all of the evidence in the record -- not just the contractual language -- when determining whether these doctrines apply. See, e.g., Le Fort, 199 N.E.3d at 1263; Chase Precast Corp., 566 N.E.2d at 607.

Considering all of the evidence in the record, a genuine dispute remains as to whether the state non-visitation order "entirely or substantially destroy[ed] the overall purpose of the contract[s]." Inland, 213 N.E.3d at 608.

First, a genuine dispute remains as to whether Harmony's on-site visits were "so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense." Le Fort, 199 N.E.3d at 1271 (citation omitted). On one hand, the contracts explicitly call for monthly site visits, suggesting that those visits were core to the agreement. And Samaritan's Chief Compliance Officer expressed the contemporaneous opinion by email that Samaritan "would not receive the value of [Harmony's] visit" if it was provided in a remote form. On the other hand, the site visits were only part of a larger contract that also included other services. Baranello, who negotiated and signed the contracts for Samaritan, thought that Harmony could have substantially performed its obligations under the contracts without in-person site visits. And Samaritan's Chief Compliance

Officer initially told Harmony that it was cancelling the contracts due to "the extreme financial constraints that the COVID-19 pandemic has placed on [Samaritan]." A factfinder could infer that Samaritan's financial situation -- not frustration of purpose -- was its real reason for cancellation. Considered together, these facts establish a genuine dispute as to whether in-person site visits were "so completely the basis of the contract" that their absence frustrated Samaritan's purpose in contracting. This dispute precludes summary judgment.[3]

Second, it is not clear that the temporary impediment posed by the non-visitation order frustrated the entire purpose of the three-year contracts. The record does not clearly say how long the non-visitation order remained in effect. But Massachusetts courts emphasize that an unforeseen impediment of relatively short duration may not frustrate the purpose of a longer-term contract. See, e.g., Inland, 213 N.E.3d at 607-09. This consideration bolsters our conclusion that summary judgment on the application of the frustration of purpose doctrine was not appropriate here.

---

[3] By the same token, the factual dispute precludes summary judgment for SMS, which SMS also argues that it deserves. The issue must be determined by a factfinder at trial.

- 14 -

SMS next argues that, even assuming that Samaritan's performance was excused, it should have been excused only for the duration of the non-visitation order. SMS notes that, on May 6, 2020, Harmony offered to suspend rather than terminate the contracts. Instead, Samaritan unilaterally cancelled them. We agree that this issue, too, belongs before a jury.

"[T]he frustration of purpose defense can be temporary." Le Fort, 199 N.E.3d at 1272. "But in that situation, 'the defense will suspend, rather than discharge, a duty to perform unless the party's performance after the cessation of the . . . frustration would be materially more burdensome than had there been no . . . frustration.'" Inland, 213 N.E.3d at 609 (quoting Le Fort, 199 N.E.3d at 1257). "Thus, even if [one party] could show that the purpose of the [contract] was temporarily frustrated, the temporary frustration would have merely suspended, not discharged, [that party]'s obligation to [perform] during the closure period." Id. (citing Restatement § 269, cmt. a ("When the circumstances giving rise to the . . . frustration cease to exist, [the party] must then perform.")).

Samaritan counters that, at the time, it was not clear how long the non-visitation order would be in effect, and that Harmony "accepted" termination of the contract. But Samaritan cites no authority in support of its contention that those factors

displace the presumption of suspension set forth by Massachusetts courts. Whether Samaritan's performance was excused only temporarily -- if it was excused at all -- is also a question reserved for the factfinder.

### B. SMS's Other Arguments

We last briefly dispose of SMS's remaining contentions. SMS argues that the state non-visitation order was "merely a recommendation" and did not actually preclude Samaritan from permitting visitors on premises during the height of the COVID-19 pandemic. As Samaritan points out, SMS did not make this argument to the district court. SMS has waived this argument, see Carrozza v. CVS Pharmacy, Inc., 992 F.3d 44, 59 (1st Cir. 2021) ("[A]ppellants cannot raise an argument on appeal that was not squarely and timely raised in the trial court." (internal quotation marks and citation omitted)), and we decline to reach it.

SMS next argues that the non-visitation order prohibited entrance by "gratuitous visitors for an individual patient, not vendors." SMS says that interpreting "visitor" to include a visiting "vendor" is "overbroad" because of "its logical conclusion [that] any vendor, including vendors who provide necessary food, medicine and other services that are regularly delivered, would be precluded from entry." But the state directive specifically allowed "medically necessary" visitors. And SMS offers no relevant authority to suggest that a "vendor" making on-

site visits to a nursing home is somehow not a "visitor." In short, SMS offers no reason in law or logic to find that a vendor who visits a nursing home is not a visitor.

SMS finally argues that Samaritan's conduct violated the implied covenant of good faith and fair dealing and Massachusetts General Law Chapter 93A, the state's Consumer Protection Act. SMS says -- without cogent explanation -- that Samaritan's reliance on the non-visitation order and its use of lawyers violated the covenant and Massachusetts law.

"[E]very contract in Massachusetts is subject to an implied covenant of good faith and fair dealing." Robert & Ardis James Found. v. Meyers, 48 N.E.3d 442, 449 (Mass. 2016). "[A] breach occurs when one party violates the reasonable expectations of the other." Id. (quoting Chokel v. Genzyme Corp., 867 N.E.2d 325, 329 (Mass. 2007)). The complaining party "has the burden of proving a lack of good faith." Id. at 450 (citation omitted). Here, SMS points to no evidence suggesting that Samaritan lacked good faith. Its opaque references to the New York Health Advisory and Samaritan's use of lawyers do not make out a cognizable theory of how Samaritan purportedly breached the covenant. Similarly, we do not discern an explanation of how Samaritan purportedly breached Massachusetts consumer protection law. We affirm the grant of summary judgment on both of these causes of action.

- 17 -

**IV. CONCLUSION**

The district court's grant of summary judgment is REVERSED IN PART and AFFIRMED IN PART. The case is REMANDED to the district court for further proceedings consistent with this opinion.